**FAIRBANKS NORTH STAR BOROUGH, Appellant and Cross-Appellee,**

v.

**TUNDRA TOURS, INC., Appellee and Cross-Appellant.**

Nos. S–524, S–554.

Supreme Court of Alaska.

May 9, 1986.

Ronald E. Noel, Gail M. Ballou, Hughes, Thorsness, Gantz, Powell and Brundin, Fairbanks, for appellant and cross-appellee.

Barbara L. Schuhmann, Charles D. Silvey, Schaible, Staley, DeLisio & Cook, Inc., Fairbanks, for appellee and cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

### FACTUAL AND PROCEDURAL BACKGROUND

In December 1979, the Fairbanks North Star Borough School District (school district) awarded Tundra Tours, Inc. a five year contract[1] to provide bus transportation for school children in the Fairbanks and North Pole areas. Tundra Tours' bid proposed $12,208 per day for basic contract services, nearly a $10,000 per day reduction over the previous Fairbanks school bus contractor.

With this reduction in cost, however, came a reduction in the bus service provided. In awarding the bid to Tundra Tours, the school district chose to purchase only

---

1. The contract covered the period from July 1, 1980 to June 30, 1985.

those bus services for which the State of Alaska provided reimbursement. At the time the contract was awarded, the state would reimburse school districts only for mileage traveled along "maintained" roads, a term of art defined by administrative regulations.[2]

The school district did not anticipate the extent of public "uproar over having lost basically door-to-door service." The school district responded by soliciting from Tundra Tours an estimate of the cost of expanding service to reinstate the previous year's bus routes.

In a September 10, 1980 letter to school district transportation coordinator Bob Clark, Tundra Tours stated that it had "studied the impact on the school bus contract should the state waive regulations on duplicate mileage and service on unmaintained roads," and concluded that the additional service would have "an overall time impact of 14.7 per cent."

On September 16, 1980, Clark attended the Fairbanks North Star Borough School Board meeting to obtain approval to implement the additional bus services.[3] He told the school board that the maximum cost for the nonmaintained service would be $1,800 per day, or $50,000 per month. Clark testified that this approximate figure was arrived at by multiplying 14.7% times the $12,208 per day basic contract price. The school board voted to "reserve $50,000 for the purpose of providing transportation in areas that are not covered by the present regulations pending State Board action." The school board anticipated that the state would amend its reimbursement regulation, 4 AAC 27.010(a)(2); however, if the change

were not retroactive the local money would cover one month of the nonmaintained services.

At the close of the meeting, Clark told Thomas Hyatt and Don Dennis, Tundra Tours' management staff, to begin the non-maintained service immediately. Clark expressed no reservation at that point as to the price, or the amount of service that would be involved.

Tundra Tours was concerned that the addition of the nonmaintained services would make it difficult to comply with contractual deadlines for determining compensation.[4] Despite this reluctance, the management staff of Tundra Tours worked closely with Clark to reinstate the previous year's routes, and most of the nonmaintained roads were being serviced by mid-October 1980. Clark approved each new route.

Meanwhile, the school district waited for the state to amend its regulation to cover reimbursement for nonmaintained routes. In August 1981, however, all hopes of a regulatory change died.

Tundra Tours began billing the school district for the nonmaintained service at the quoted 14.7% rate in November 1980. During the remainder of the 1980–81 school term, Tundra Tours sent monthly billings to the school district. In each billing, Tundra Tours requested that the school district inform them of written communication from the state regarding reimbursement. The school district paid for none of the nonmaintained service.[5]

---

2. Specific contractual provisions and the relevant regulations, 4 AAC 27.005–.120, are set out more fully in the discussion section.

3. Hereinafter, services under the contract will be termed "basic contract services." Services added pursuant to the September 16 school board meeting will be termed "nonmaintained services."

4. Specifically, the contract required that by October 1, 1980 Tundra Tours furnish the school district with a calculation of the number of buses necessary to provide the service required under the contract. The contract also required

Tundra Tours to furnish the school district with bus time and mileage reports and route maps by October 1 of each year.

5. The trial court stated in Finding 9:

 If in fact the state had changed the regulation and would reimburse the Borough, the parties would not be before the court now. It is very clear to the court that the Borough changed its attitude towards payment for the various extra services because of the lack of reimbursement from the state.

Finally, in the summer of 1981, Tundra Tours informed the school district that if payments for nonmaintained service were not received, Tundra Tours would provide only services required under the basic contract. On August 5, 1981, Tundra Tours filed suit against the school district and the borough. In response, the school district obtained a temporary restraining order requiring Tundra Tours to continue the same service as it provided during the first year. The parties stipulated that the nonmaintained road service would continue without prejudice to their respective positions. Tundra Tours thus provided extra-contractual bus services without payment from September 1980 through the trial in early April 1984.

Superior Court Judge Jay Hodges granted partial summary judgments on different issues against the school district and Tundra Tours. Judge Hodges found that "the original contract did not provide for bus service by Tundra Tours, Inc. on non-maintained roads," but that this contract was "amended by the action of the parties to require Tundra Tours, Inc. to provide the service on non-maintained roads." He also ruled that Tundra Tours' compensation should be determined on the basis of the reasonable worth of the nonmaintained service, rather than the 14.7% rate claimed by Tundra Tours.

On April 27, 1984, Judge Hodges entered judgment against the school district, ordering it to pay a total judgment of $1,907,-409.42. He later entered findings of fact and conclusions of law. Due to the school district's then-pending third party complaint against the state, the parties stipulated that the court's judgment should be considered a final judgment for appeal purposes. The school district appealed, and Tundra Tours cross-appealed. The court eventually dismissed the third party complaint.

## DISCUSSION

The central issues in this case involve interpretation of the school transportation contract. They include whether the trial court erred in interpreting the contract with regard to: (1) the scope of the non-maintained service; (2) the one-month contract for nonmaintained service; (3) the reasonable value of the nonmaintained service; (4) the divisor formula; and (5) the summer special education service.

Five additional issues on appeal concern alleged procedural errors in the trial court regarding: (1) deposition testimony; (2) prejudgment interest; (3) actual expert witness fees; (4) attorney's fees; and (5) the timeliness of the cost bill.

### I. CONTRACT CLAIMS

■ Upon numerous occasions, this court has reiterated the method of analysis in contract actions of this nature. In order to give legal effect to the parties' reasonable expectations, the court must look first to the written agreement itself and also to extrinsic evidence regarding the parties' intent at the time the contract was made. *Norton v. Herron,* 677 P.2d 877, 879–80 (Alaska 1984).[6] The parties' reasonable expectations are assessed through resort to the language of the disputed provision and other provisions of the contract, relevant extrinsic evidence, and case law interpreting similar provisions. *Peterson v. Wirum,* 625 P.2d 866, 872 n. 10 (Alaska 1981). Relevant extrinsic evidence can include subsequent conduct of the parties. *Id.* at 870 n. 7. *See also Mitford v. de Lasala,* 666 P.2d 1000, 1005 (Alaska 1983).

■ Generally, interpretation of words in a contract is a task for the court. *Alyeska Pipeline Service Co. v. O'Kelley,* 645 P.2d 767, 771 n. 2 (Alaska 1982); *State v. Fairbanks North Star Borough School Dist.,* 621 P.2d 1329, 1331 n. 5 (Alaska 1981). However, the standard used in re-

---

**6.** In *Wright v. Vickaryous,* this court noted that it has moved away from the cumbersome two-step process of evaluating extrinsic evidence only after a preliminary finding of ambiguity. 598 P.2d 490, 497 n. 22 (Alaska 1979). Extrinsic evidence may be turned to initially in construing a contract, whether or not the contract appears ambiguous on its face. *Peterson v. Wirum,* 625 P.2d 866, 871 (Alaska 1981).

viewing factual findings must be applied where extrinsic evidence is in dispute. *Jackson v. Nangle,* 677 P.2d 242, 247 n. 4 (Alaska 1984).

At trial, Judge Hodges admitted extrinsic evidence concerning the parties' agreement to extend bus service beyond those routes specified in the contract. School district officials and Tundra Tours' management testified as to the reasons for extending bus service, and as to their conduct before and after the school board meeting at which Tundra Tours was ordered to begin immediately the nonmaintained service. Because extrinsic evidence was presented at trial regarding interpretation of the parties' agreement, we are confined to determining whether the facts support the trial court's interpretation. *Jackson v. Nangle,* 677 P.2d at 247 n. 4. We will not reverse the trial court's factual findings based upon this evidence unless they are clearly erroneous. *Id.*

### A. NONMAINTAINED ROAD SERVICE.

The central dispute in this case concerns the amount of compensation due Tundra Tours for nonmaintained services, that is, services outside the scope of the basic five year contract. The school district seeks to reduce the amount of compensation by arguing that some of the services that the trial court classified as nonmaintained were actually basic contract services for which Tundra Tours was already compensated. The school district contends that four of the trial court's factual findings with regard to nonmaintained road service are clearly erroneous.

#### 1. *"Maintained" Roads Within the Contract.*

█ First, the school district challenges Finding 8 which addresses the definition of "maintained" roads. The trial court found that:

> [s]uch roads, in addition to having any public funds expended, must be maintained to a certain standard and it was certainly contemplated at the outset of the contract that there was a certain maintenance standard and condition of roads necessary before service would have to be provided over them.

The school district contends that "the contract called for service congruent with state reimbursement regulations, which do not address the actual physical condition of a given road on any given day." The school district also points to testimony of Tundra Tours' management staff that the contract provision regarding maintained road routing refers to "maintained by public funds." It thus concludes that Finding 8 is devoid of evidentiary support.

The contract calls for the transportation of eligible pupils, as defined in 4 AAC 27.010.[7] In addition to incorporating the regulation by reference, a provision of the contract also paraphrases the regulation. Paragraph 3B states:

> In the designation and selection of routes, routes shall be limited to operation of equipment on highways, roads and streets which are under the supervision and all-weather maintenance of State DOT, a Municipality, a Borough Service Area or other agency supported by public funds.

Both of these provisions speak in terms of physical maintenance and not simply jurisdiction by a public entity.

Extrinsic evidence also supports the trial court's finding. Tundra Tours submitted a list of roads which it was required to add to its service only after the nonmaintained

---

7. 4 AAC 27.010(a) (Eff. 9/14/77) provides in pertinent part:

 (a) A regular pupil transportation route may be established by a school district if

 . . . .

 (2) *the entire route is over regularly maintained roads, having at least a gravel surface, which are under the supervision and all-weather maintenance of the Alaska Department of Highways, a public utility district, a municipality, a borough service area, or any other agency supported by public funds;* adequate turnaround space for transportation vehicles must be available on the route.

(Emphasis added).

agreement was in place. Some of the roads added as nonmaintained service did not receive the all-weather maintenance which the contract requires. This is evidence that the parties originally contemplated a physical maintenance standard. The school district submitted lists of nonmaintained roads which eliminated all roads under the maintenance jurisdiction of a public entity regardless of road condition, but did not offer evidence that a public entity actually maintained those particular roads. The trial court concluded that "nonmaintained" roads did not become "maintained" roads by virtue of their jurisdictional status. This finding is supported by language of the contract, incorporated regulations, and extrinsic evidence. We therefore affirm the trial court's use of a minimum maintenance standard in interpreting the term "nonmaintained" under the contract.

## 2. *Offset for Enroute Hazardous Service.*

■ Some factual background is necessary to understand this contract claim. When the parties entered into the contract, the state did not reimburse school districts for bus service for children who lived within one and one-half miles of school, pursuant to 4 AAC 27.010(a)(1).[8] An exception to this rule was 4 AAC 27.035,[9] which permitted transportation on "hazardous routes" within one and one-half miles of school "which cannot be safely traveled by children because of traffic, weather, or other hazards...."

School district transportation coordinator Clark creatively interpreted 4 AAC 27.035 as permitting Tundra Tours to depart from the main route, travel up a spur to pick up a child, and return to the main route, even though the child did not live within one and one-half miles of school. Clark coined the term "enroute hazardous" to refer to this service. By this interpretation, the school district attempted to avoid the state regulation incorporated into the contract which prohibited reimbursement for duplicate mileage, or backtracking.[10]

The school district achieved two financial benefits by this creative interpretation. First, under 4 AAC 27.035(d), the district could seek reimbursement from the state for up to 50 percent of its hazardous route costs.[11] Second, Clark required Tundra Tours to provide the enroute hazardous service at its quoted hazardous rate.[12]

8. 4 AAC 27.010(a)(1) (Eff. 9/14/77) provides in relevant part:
 (a) a regular pupil transportation route may be established ... if
 (1) there are eight or more pupils who reside more than one and one-half miles from the attendance center to be used by the route
 ...

9. 4 AAC 27.035 (Eff. 9/14/77) provides in pertinent part:
 (a) Those routes within one and one-half miles of an attendance center which cannot be safely traveled by children because of traffic, weather, or other hazards may be designated by the governing body of the district as hazardous routes.

 (d) Subject to the availability of funds, the departments will reimburse a district for up to 50 percent of its costs for hazardous routes.

10. Paragraph 7A. adopts and makes chapter 27 state regulations a part of the contract.
 4 AAC 27.010(b) (Eff. 9/14/77) states that:
 (b) A transportation route must be free from duplicate mileage unless

 (1) the pickup point requiring the duplicate mileage serves at least three pupils and is at least one mile one way from the main route; or
 (2) the pickup point requiring the duplicate mileage serves 15 or more pupils.

11. The state ultimately denied the district's request for reimbursement for enroute hazardous service because that service did not fit the definition of hazardous route service contained in 4 AAC 27.035(a).

12. Tundra Tours' costs for enroute hazardous service were greater than for scheduled hazardous service. Scheduled hazardous service was within one and one-half miles of the school, generally was run on maintained roads, and the drivers received a lower rate of pay. On the other hand, enroute hazardous service was often a great distance from the school, frequently was run on nonmaintained roads and cost Tundra Tours more in labor costs because the drivers had to be paid the regular rate, which is higher than the rate for scheduled hazardous service. Despite these higher costs, Tundra Tours agreed to provide the enroute hazardous service at its quoted scheduled hazardous price.

During the first year of service, Tundra Tours billed the school district monthly for the enroute hazardous service and the school district paid without expressing reservations. After the first year, however, the parties frequently disagreed over the amount of enroute hazardous service that was being performed. In the spring of 1983, the parties reached a compromise and settlement, and agreed to a price per day that was not based on the actual amount of service Tundra Tours was providing.

The parties now dispute the effect of that settlement agreement. The school district contends that the trial court's finding on the issue is clearly erroneous. In Finding 20, the trial court stated:

> The Borough's assertion of an offset for enroute hazardous service is not well taken. The evidence demonstrated that the parties contemplated that service to be totally separate extra service on both maintained and nonmaintained roads. The parties have settled and agreed upon a fixed price per day for such service. The Borough is not allowed an offset for payments made in the past, some of which were pursuant to a compromise and settlement as to this extra service.

The school district argues that the trial court's ruling on this issue permits Tundra Tours to recover twice for that service, both as enroute hazardous service and nonmaintained service. It asserts that the trial court should have accounted for the duplication by offsetting amounts already paid, or by deducting enroute hazardous time or mileage from the total nonmaintained service time or mileage.

Tundra Tours presented evidence that nonmaintained service was not made any part of the settlement, and in fact was not even discussed during negotiations on the enroute hazardous service, even though the dispute over nonmaintained payments already had arisen. Tundra Tours contends that it agreed to waive the duplicate mileage provision and implement enroute hazardous service with the understanding that it would still be paid a blanket increase for nonmaintained service. It argues that the

trial court correctly found that the enroute hazardous agreement was totally separate. Tundra Tours concludes that the trial court's finding should be affirmed first, in light of the settlement, and second, because the school district made payments without reservation under the enroute hazardous agreement and is therefore estopped from arguing that those payments are an offset to nonmaintained service.

We believe the evidence, viewed in the light most favorable to Tundra Tours, supports the trial court's interpretation of the contract. *See Wright v. Vickaryous*, 598 P.2d 490, 497 (Alaska 1979).

Nonmaintained service was implemented and billed as an extension of the *basic contract*. The original 14.7% charge was a function of the price per day of that basic agreement. Tundra Tours intended to spread the extra maintenance, labor and insurance costs incurred in providing nonmaintained service across the basic contract because these expenses were in the nature of overhead.

In contrast, extra-contractual services, such as the enroute hazardous service, were provided and billed under a completely separate agreement. Because the basic contract was meant to cover overhead and profit, Tundra Tours offered these extra-contractual services at a price based on its direct operating expenses for running the routes. When Tundra Tours and the school district reached a compromise on the enroute hazardous dispute in the spring of 1983, they did not discuss the price of nonmaintained service or the effect that the compromise would have on the pending litigation. Tundra Tours did not ask or receive a higher price for enroute hazardous service on nonmaintained roads than it did for the same service on maintained roads.

The parties' agreement regarding enroute hazardous service was intended to end wrangling between them on the exact amount of enroute hazardous service being provided. Tundra Tours agreed to payment for less service than it believed it was providing in order to eliminate perpetual auditing by the school district. This com-

promise concerned a completely separate agreement for extracontractual services. It did not involve Tundra Tours' claim for payment for nonmaintained service, and in fact the school district did not pay any amount toward those services. Therefore, the trial court properly found that there should be no offset for enroute hazardous service payment.

### 3. *Special Education Services.*

 The school district next challenges the trial court's finding that nonmaintained road services for special education students was not part of the parties' basic contract. The trial court based its findings on the language of the contract and the invitation to propose document.

Although the school district concedes that nonmaintained road service was not within the literal terms of the parties' written contract, it contends that the trial court gave a hypertechnical interpretation to the language of the contract, and paid too little attention to extrinsic evidence that bears on the parties' intentions. The school district argues that extrinsic evidence established that both the school district and Tundra Tours had contemplated from the outset that special education students would be furnished whatever transportation they required.

Neither the contract, nor the incorporated state regulations, are ambiguous with regard to special education services. Both paragraph 3B of the contract, and 4 AAC 27.020,[13] incorporated by reference, require that both regular routes and special education routes be on maintained roads.

Further, Tundra Tours' actions do not support the school district's interpretation. Tundra Tours presented evidence that instead of initially planning to provide special education services door-to-door, they were faced with a "crisis-call" situation when

school began in 1980. Special education routes had not been prepared or approved, as had been done for regular routes. As the trial court noted, early correspondence between the parties indicates Tundra Tours' intent on this issue. In its September 10, 1980 letter to Clark, Tundra Tours indicated that the overall time impact for adding nonmaintained services was 14.7%. However, in the letter Tundra Tours qualified which services were covered by the 14.7% figure:

> The figures developed and available for back-up to the above are on regular bus service routes only. Special Education routes provide special problems with high time investment, door-to-door service, etc., however, *Tundra Tours would include Special Education routes in an across-the-board fashion.*

(Emphasis added). This statement indicates that Tundra Tours included special education services on nonmaintained roads in its offer to provide nonmaintained services.

We affirm the trial court's finding that special education services were not part of the basic contract, and therefore required additional compensation under the nonmaintained agreement.

### B. CONTRACT FOR ONE MONTH'S NONMAINTAINED ROAD SERVICE.

 The trial court found that the school district and Tundra Tours entered into a contract for the first month of nonmaintained service, but that there was no agreement as to price after that month.

The trial court's factual findings are based upon extrinsic evidence, and therefore should not be set aside unless clearly erroneous. *Jackson v. Nangle,* 677 P.2d at 247 n. 4. We believe the facts support the trial court's interpretation of the contract.

---

**13.** 4 AAC 27.020(b) (Eff. 9/14/77) provides in pertinent part:
 (b) When special education pupils must be transported separately, school districts may establish separate special education routes, subject to approval of the commissioner....

These special education routes must meet the following conditions:

 (2) the criteria set forth in sec. 10(a)(2) of this chapter must be met.

The school district contends that the trial court was clearly erroneous in finding that the parties had reached an agreement regarding price for the month of October. It argues that the school district and the school board understood that the numbers presented at the September 16, 1980 school board meeting were nothing more than a ceiling on the price.

At the September 16 school board meeting, Clark presented cost figures for non-maintained services based upon Tundra Tours' offer to provide those services at 14.7% of its bid price. The school board set aside a $50,000 reserve based upon those figures. Immediately following the meeting, Clark told Tundra Tours' managers to implement the nonmaintained service.

In Tundra Tours' November 10, 1980 letter to the school district, Don Dennis provided the "initial billing for non-maintained roads service" with a calculation of $36,-191.00 based on 22 school days of additional service in the month of October. In light of this correspondence and the events at the September 16 school board meeting, we believe there is sufficient evidence in the record to support the trial court's finding that an agreement as to service and price existed for October 1980.[14]

## C. REASONABLE VALUE OF THE NONMAINTAINED SERVICE.

### 1. *Proper Legal Standard.*

■ The school district challenges the legal standard applied by the trial court in determining the value of the nonmaintained services. The school district argues that

cost of performance is not a factor which is relevant when applying a quantum meruit theory of recovery, and inasmuch as the trial court expressly declared its finding was based in part on testimony concerning cost, reversal of that finding is required.

■ The school district cites *Allan Construction Co. v. United States,* 646 F.2d 487, 494 (Ct.Cl.1981) and *Cities Service Gas Co. v. United States,* 500 F.2d 448, 457 (Ct.Cl.1974). In these cases, the United States Court of Claims stated that value determined under quantum meruit is not based on costs, but on marketplace value. However, neither of those cases held that cost evidence may not be considered.[15]

The majority rule in quantum meruit recovery is that absent an agreement fixing compensation, any evidence tending to show the reasonable value of services is generally admissible. *Peavey v. Pellandini,* 97 Idaho 655, 551 P.2d 610, 616 (1976); 66 Am.Jur.2d, Restitution and Implied Contracts, § 89 at 1031 (1973).

The Oregon Supreme Court has allowed "evidence of the plaintiff's actual costs and ordinary industry allowance for overhead and profit", stating that it was "relevant to the jury's determination of the reasonable value of the services and materials which were furnished." *City of Portland v. Hoffman Construction Co.,* 286 Or. 789, 596 P.2d 1305, 1314 (1979). The Idaho Supreme Court allowed evidence of cattle feed costs in a suit brought to recover the reasonable value of the plaintiff's services caring for and feeding cattle. *Peavey,* 551 P.2d at 616. *See also Eaton v. Engelcke*

---

**14.** Tundra Tours contends that the trial court erred in holding that the contract ended when the school district unilaterally sent Tundra Tours the October 31, 1980 letter stating that it had not agreed to the price Tundra Tours had quoted. However, Tundra Tours did not include this issue in its Points on Appeal as required by Alaska R.App.P. 210(e). We therefore do not address Tundra Tours' contentions.

**15.** In its appellate brief, the school district appears to have equated recovery in quantum meruit and recovery under the doctrine of unjust enrichment. In determining the measure of damages in a claim of unjust enrichment the

court focuses upon the amount of benefit which the defendant received which would be unjustly retained, and does not necessarily focus on the value of money, labor, and materials provided by the plaintiff to the defendant. *Gillette v. Storm Circle Ranch,* 101 Idaho 663, 619 P.2d 1116, 1119 (1980). On the other hand,

the measure of recovery on quantum meruit is the reasonable value of the service rendered to the benefited defendant, and 'not the value of the actual benefit realized and retained by the recipient.'

*Peavey v. Pellandini,* 97 Idaho 655, 551 P.2d 610, 616 (1976).

*Manufacturing, Inc.,* 37 Wash.App. 677, 681 P.2d 1312 (1984) (evidence of time spent on project supports quantum meruit recovery); *Heaton v. Imus,* 93 Wash.2d 249, 608 P.2d 631, 633 (1980) (lost profits an appropriate element in quantum meruit recovery); *Dravo Corporation v. L.W. Moses Co.,* 6 Wash.App. 74, 492 P.2d 1058, 1069 (1971) (profit included in quantum meruit computation).

The legal standard applied by the trial court is consistent with the majority view. We agree that evidence of actual costs is relevant to a determination of reasonable value.

### 2. *Factual Findings.*

#### a. Market Value Evidence at Trial.

■ The school district next contends that the trial court's findings as to the reasonable value of the nonmaintained road service are clearly erroneous because the figure bears no reasonable relation to the market value. The school district argues that the trial court ignored ample evidence of the actual market value and focused on the original contract price.[16]

We find considerable evidentiary support for the trial court's reasonable value finding. First, the award was less than the school district expected to pay. The school district estimated the first year's services would cost $300,000. The court awarded $250,047.60, with cost of living increases for the subsequent years. Second, the previous contractor in 1979–80 was paid $22,000 per day. The combined total of Tundra Tours' basic contract service ($12,208 per day) and the amount awarded for nonmaintained service ($1,645 per day) is $13,853 per day, or more than $6,000 less than previous contractor received for the same services.

Third, the court's award was reasonable in light of the other submitted bids for the basic contract service only. In fact, the $13,853 combined total for Tundra Tours' services is still less than most of the bids submitted for basic contract services in 1979.

Fourth, Paul Taylor, a financial expert, testified that just to receive the national average rate of return of seven percent for school bus contractors that Tundra Tours should receive $22,896 per day. He testified further that even if Tundra Tours were awarded the full amount sought at trial, that the contract would still be unprofitable for them.

Fifth, an outside contractor hired to provide the nonmaintained service would have cost between $2,610 to $4,200 per day. By adding the service to existing basic contract routes at $1,645 per day, Tundra Tours saved the school district a substantial amount.

In sum, considerable evidence at trial supports the trial court's findings as to the reasonable value in the market place of the nonmaintained road service. Therefore, these findings are not clearly erroneous.

#### b. Newly Developed Evidence.

■ In its reply brief, the school district argues that newly developed evidence shows that the trial court overvalued the nonmaintained road service.

The school district solicited bids for a new five year contract to commence at the expiration of the Tundra Tours contract on June 30, 1985. It recounts that three out of four busing contractors, including Tundra Tours, represented that they could provide all the services then provided by Tundra Tours for a price less than Tundra Tours now charges for the regular service alone. The school district requests, on the basis of this newly developed evidence, that this court reverse the trial court's judgment and remand the matter for the taking

---

16. The school district's evidence as to market value goes to the value of supplemental services, that is, the cost of adding services, (e.g., shuttle services) where the majority of overhead costs are already accounted for by the basic contract. However, Tundra Tours' evidence at trial showed that nonmaintained road service was more costly than regular service, and Tundra Tours incurred expenses which were not accounted for by the basic contract.

of additional testimony and evidence and the entry of new findings.

In *Patrick v. Sedwick*, 413 P.2d 169 (Alaska 1966), this court stated that in order "for any evidence to come within the category of 'newly discovered' such evidence must relate to facts that were in existence at the time of trial." *Id.* at 177. The school transportation bids which the school district seeks to introduce as newly-discovered evidence were solicited while this appeal was pending, and do not relate to the reasonable value of Tundra Tours' services at the time of performance. The school district's argument is therefore without merit.[17]

### D. CONTRACT FORMULA DIVISOR.

■ At trial, the parties disputed the amount which Tundra Tours should be paid for increases over time in the number of buses needed to provide service within the scope of the basic contract.

This dispute concerns the appropriate number to be used as the divisor for Class I buses.[18] Because Tundra Tours began implementing extra-contractual services (nonmaintained road service and scheduled hazardous service) during September 1980, the parties had difficulty at trial in 1984 determining the number of buses required to perform only the basic contract services on October 1, 1980. Tundra Tours had been billing the school district at the divisor rate of forty-five. They claimed at trial, however, that the basic contract services required forty-four buses, and that to appease the school district they billed using a divisor of forty-five.[19]

The school district initially agreed with the divisor figure of forty-five, but later identified additional routes which also transported students who were covered by the basic contract. The school district concluded that had the supplemental services not been added, Tundra Tours would have needed forty-seven buses to provide the basic contract service.

The trial court rejected both parties' arguments, and ruled that "as between the plaintiff's 44 and the defendant's 47" the appropriate divisor was forty-five. The court also found that the parties should "be bound by that figure, used and agreed to by them during the first school year for billing purposes. They should not be heard to assert a different position than that taken in the first year."

We hold that the school district waived any objection to Tundra Tours' use of forty-five as the divisor.

A waiver may be accomplished explicitly or implicitly, the latter arising "where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to the other party." *Jackson v. Nangle*, 677 P.2d at 249 *quoting Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978).

---

17. The school district has filed a Civil Rule 60(b) motion for relief in the superior court in the event that the request for relief must be addressed first to the court that rendered the judgment. *See* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2865, at 224–25 (1973). In light of our decision on this issue, that motion is rendered moot.

18. The contract provides that compensation will be based on a daily service area basis for the type of vehicle, Class I or Class II buses. Tundra Tours proposed a daily service price of $11,336 for Class I buses and $872 for Class II buses, for a total daily price of $12,208. The necessary number of buses for the purpose of the basic contract services was to be determined as of October 1, 1980, which would allow time for inevitable adjustments before ascertaining the base level of service needed for the five year period. Tundra Tours' compensation would be adjusted as buses were added or deleted by using a formula. The numerator was to be the per day rate bid for that class of bus. The denominator, or "divisor," was to be the number of buses necessary to provide the basic contract service on October 1, 1980.

19. By billing at 45, when 44 buses were actually being run, Tundra Tours *reduced* the per bus per day rate which it would receive for buses added or deleted in subsequent years. Tundra Tours' general manager testified that by using the divisor of 45, it reduced the rate about $6.00 per bus per day.

The school district knew that the divisor was to be determined by October 1, 1980, but insisted that the extra-contractual non-maintained service be implemented before that date, making difficult the determination of the divisor. The school district did not object to the routing, and did not object to the divisor figure of forty-five used by Tundra Tours in its billing until the spring of 1981 when it had become apparent that the state would not be reimbursing the school district for nonmaintained service. Tundra Tours detrimentally relied upon the school district's acknowledgement of the divisor figure of forty-five used in its billing. Tundra Tours did not charge the school district for additional buses added for convenience, and it cooperated in good faith with the school district in the face of the chaos created by the implementation on short notice of supplemental services. For these reasons, we affirm the trial court's findings on the divisor claim.

### E. SUMMER SPECIAL EDUCATION SERVICES.

■■■■ During the summers of 1981, 1982 and 1983, Tundra Tours contracted with the school district to provide transportation for special education students who were attending summer school. These services were neither part of the basic contract, nor the same type of service which Tundra Tours provided under the heading of extra-contractual services (e.g., scheduled hazardous, or shuttle buses for school activities). Accordingly, Tundra Tours billed the school district in a different manner. During the winter, under the basic contract, Tundra Tours recovered costs for "overhead," and therefore did not charge the school district for "its drivers' time spent in extra-contract service, in preparing, safety-checking, and cleaning buses at the barns, or for 'deadhead time,' to get the first student from the barn or from the last student's home to the barn (or in-between schools for special education shuttles)."

During the summer, Tundra Tours charged total employee hours to cover overhead costs for which it was not otherwise compensated. Daily rates were set at a fixed amount for the first six hours of summer service, and an hourly rate was charged for time in excess of six hours.

In 1981 and 1982 the school district paid according to Tundra Tours' billings. During those two years, Tundra Tours dealt with school district administrator Duncan Hunter. Tundra Tours claims to have discussed the billing system with Mr. Hunter and to have understood that he agreed to this method.

At the end of the 1983 summer service, school district transportation coordinator Bob Shefchik compared the monthly billings (which included a breakdown of the hours per bus per day) with the route sheets (which outlined route hours), and found what he believed to be an inconsistency. Shefchik called Tundra Tours' dispatcher and was informed that Tundra Tours was charging for "sign on and sign off times." [20] Shefchik objected to the billing method and authorized payment only for the buses' running time.

At trial, the school district sought reimbursement for payments made for sign on and sign off time during the summers of 1981 and 1982. The superior court ruled that the school district was estopped to recover the amounts paid in 1981 and 1982. The court stated in Finding 50:

> The documents themselves reflect how the time was computed. Even if Mr. Hunter did not look at them, the fact is he should have looked at them. It is obvious that if he had looked at them or somebody knowledgeable had looked at them, they would have seen how the hours were computed, which the Borough now complains should not have been charged.

With regard to summer services in 1983, however, the court ruled that the school

---

**20.** Shefchik testified that he was informed that 10 minutes were added to sign on and 10 minutes to sign off each daily route, and that during this time the driver cleaned and checked the bus and filled out route sheets. Shefchik asserted that this could amount to an additional billable hour per day, and that he told Tundra Tours that this was unreasonable.

district was not obligated to pay the additional sum requested by Tundra Tours (the difference between the amount billed and the amount paid, reflecting charges for sign on and sign off times). The court based these findings on an industry practice "to bill for running time, not take-up time."

The school district appealed the trial court's rulings concerning summer services in 1981 and 1982. Tundra Tours cross-appealed the trial court's rulings concerning summer services in 1983.

The school district argues that "a knowledgeable person could not have understood that the school district was being overcharged simply by inspecting Tundra Tours' billings and the accompanying breakout sheets, and there is no evidentiary support for the superior court's finding to the contrary."

This argument is without merit. School district administrator Shefchik discovered what he believed to be an inconsistency by comparing the billings and breakout sheets *with route sheets.* Routes were approved by the school district and thus route sheets were available for review before this discovery at the end of the 1983 summer. If indeed no school district administrator made this comparison, nor inquired as to how hours were billed for summer services,[21] this is conscious ignorance. Under these circumstances, we believe it is reasonable to allocate the risk of mistake to the school district. *See* Restatement (Sec-

ond) of Contracts § 154(c) and comment d. at 404 (1981).

■■■ The parties' contract was ambiguous as to whether or not sign on and sign off times were compensable. We conclude that the conduct between Tundra Tours and the school district established a common, objective basis of understanding for interpreting the expressions the parties used in the summer contract. Tundra Tours presented the school district with billings, showing the hours charged per bus per day, which could be compared to route sheets, also in the school district's possession, showing route hours per bus per day. The school district paid according to Tundra Tours' billings for two years, manifesting its assent to the billing methodology used.[22] We therefore hold that the parties' course of dealing governs the interpretation of the billing methodology under the summer contracts and the school district may not recover payments it made in 1981 and 1982.

We also agree with Tundra Tours' argument on cross-appeal that the trial court erred in interpreting the summer 1983 contract by requiring an alleged industry practice of billing only for bus running time to prevail over the parties' course of dealing during two previous summer service contracts. This is a question of law, which we may independently review. *See Norton v. Herron,* 677 P.2d 877, 880 (Alaska 1984). We believe that both the Uniform Commercial Code and the common law of contract interpretation, codified in part at AS 45.01.-205,[23] recognize that a course of dealing

---

**21.** Tundra Tours claims to have discussed its billing method for summer services with Duncan Hunter, who oversaw the 1981 and 1982 summer service contracts for the school district.

**22.** According to Restatement (Second) of Contracts § 20(2) (1981):

The manifestations of the parties are operative in accordance with the meaning attached to them by one of the parties if

. . . .

(b) that party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party.

**23.** AS 45.01.205 provides in pertinent part:

*Course of dealing and usage of trade.* (a) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

. . . .

(c) A course of dealing between parties and a usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

(d) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed where reasonable as

between parties must prevail over an industry practice in determining the reasonable intention of the parties in using particular terminology.

The Restatement (Second) of Contracts § 203 (1981) supports this position, stating in part:

> In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:
>
> (b) express terms are given greater weight than course of performance, course of dealing, and usage of trade, course of performance is given greater weight than course of dealing or usage of trade, and *course of dealing is given greater weight than usage of trade.*

(Emphasis added).

Tundra Tours may thus recover the unpaid summer 1983 payments.[24]

## II. PROCEDURAL ISSUES

### A. DEPOSITION TESTIMONY OF BOB CLARK.

██ At trial, Tundra Tours offered into evidence several excerpts from the deposition testimony of Clark. Clark dealt with Tundra Tours throughout the first year of the contract, and was employed by the school district at the time of the event about which he was questioned during the depositions. He terminated his employment with the school district in July 1981. The depositions which Tundra Tours introduced into evidence were taken in September 1981 and February 1984.

The school district objected twice to the introduction of Clark's deposition, but the court overruled the objections. The school district contends that these evidentiary rulings were incorrect, and inasmuch as the court considered Clark's deposition testimony in arriving at its findings of fact, the rulings were not harmless error.

We believe that the superior court misapplied Alaska Rule of Civil Procedure 32(a)[25] which lists the circumstances in which deposition testimony may be used in court proceedings, despite its hearsay character. Rule 32(a)(2) states that the "deposition of a party or of any one who *at the time of taking the deposition* was an officer, director, or managing agent ..." may be used by an adverse party for any purpose.

The general rule followed by federal district courts is that the deposition of a party may not be taken through one no longer employed by the party. *Colonial Capital Co. v. General Motors Corp.*, 29 F.R.D. 514, 515 (D.Conn.1961). *See also Mitchell v. American Tobacco Co.*, 33 F.R.D. 262, 263 (M.D.Pa.1963) (deposition of former president of corporation defendant could not be taken where prior to date set for taking of the deposition he had been retired); *Garshol v. Atlantic Refining Co.*, 12 F.R.D. 204, 205 (S.D.N.Y.1951) (person was retired from corporation at time deposition was taken); *Caldwell-Clements, Inc. v. McGraw-Hill Pub. Co.*, 11 F.R.D. 156, 159 (S.D.N.Y.1951) (person was not an agent of the corporation at time of service of notice of deposition).

---

consistent with each other; but, when the construction is unreasonable, express terms control both course of dealing and usage of trade and *course of dealing controls usage of trade.*
(Emphasis added).

**24.** We need not reach Tundra Tours' contention that no trade practice existed as to the billing method in dispute here.

**25.** Alaska R.Civ.P. 32(a) provides in part:

At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be

used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

. . . . .

(2) *The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent,* or a person designated under Rule 39(b)(6) or 31(a) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party for any purpose.
(Emphasis added).

One of the purposes of limiting the admission of a deposition "[w]hen the deponent at the time of taking the deposition has ceased to be an officer of the corporation, [is that] experience has shown he may be hostile to the corporation, so it would be unfair to allow his deposition to be used as evidence of an admission by the corporation." 4A J. Moore, Moore's Federal Practice § 32.04 at 32–19 (1984).

The determinative factor is whether Clark was employed by the school district at the time of taking the deposition, not at the time the pertinent events occurred. Since both depositions were taken after Clark had left the employ of the school district, their contents were not admissible by virtue of Rule 32(a)(2).

 This court will not disturb the judgment of the trial court, however, unless the erroneous admission of Clark's deposition testimony affected the substantial rights of the parties. Alaska R.Civ.P. 61. We believe the evidence contained in the disputed depositions was cumulative, thus its admission was harmless error.

The school district contends that Clark's deposition testimony must have been considered in order for the trial court to find: (1) that there was a contract for one month's maintained service; and (2) that the parties were estopped from using any divisor other than 45.

On the issue of the one month contract for nonmaintained service, Clark's testimony was surely not crucial to the court's finding, as he claimed there was no contract. His testimony on the events leading up to the September 16, 1980 school board meeting was cumulative. Tundra Tours employee Don Dennis explained the background to that meeting and the conversation with Clark afterward where Clark told Tundra Tours to begin the service. Thomas Hyatt testified on the same events. School board minutes from that meeting were also in evidence.

Similarly, Clark's testimony on the divisor issue was cumulative. Considerable other evidence was presented on that issue. Most notably, expert witness Hyatt testified extensively on the divisor calculations.

Therefore, admission of Clark's deposition was harmless error.

## B. RATE OF PREJUDGMENT INTEREST PURSUANT TO AS 09.30.065.

 Before trial, Tundra Tours made an offer of judgment pursuant to AS 09.-30.065 [26] which authorizes either the plaintiff or defendant to make an offer of judgment. The statute provides that if the final judgment is more favorable than the plaintiff's offer which was rejected, the interest rate shall be increased by two per cent per year.

Tundra Tours served an offer on March 7, 1984, five calendar days after the close of discovery on Friday, March 2, 1984.

After trial, Tundra Tours requested that the court increase the rate of prejudgment interest, as prescribed by the statute, because the judgment exceeded the amount of Tundra Tours' offer. The superior court granted the request. The school district contends on appeal that the request should have been denied. It argues that Tundra Tours' request was untimely under Alaska R.Civ.P. 6(a) [27] since it was presented five *calendar* days, rather than five *court* days after the close of discovery on Friday, March 2.

**26.** AS 09.30.065 states in pertinent part:
> On or before the 60th day following the filing of an answer in a civil action, and on the fifth day following the day discovery closes as ordered by the court, either the party making a claim or the party defending against a claim may serve upon the adverse party an offer to allow judgment to be entered in complete satisfaction of the claim for the money or property or to the effect specified in the offer, with cost then accrued.... If the judgment finally entered on the claim as to which an offer has been made under this section is

not more favorable to the offeree than the offer, the interest awarded under AS 45.45.-010(a) and accrued up to the date judgment is entered shall be adjusted as follows:
> ....
> (2) if the offeree is the party defending against the claim, the interest rate shall be increased by two percent a year.

**27.** Alaska R.Civ.P. 6(a) provides:
> *In computing any period of time prescribed or allowed by these rules,* by order of court, *or by any applicable statute,* the day of the act,

Tundra Tours argues that the offer of judgment was timely because AS 01.10.-080,[28] rather than Civil Rule 6(a), governs the calculation of time for statutory offers of judgment. Under AS 01.10.080, intervening Saturdays and Sundays are included in the computation of time, unless the last day is a holiday.[29] Calculated under AS 01.10.080, the fifth day following the close of discovery was March 7, the date upon which Tundra Tours served its offer of judgment.

We find it unnecessary to decide whether AS 01.10.080 or Civil Rule 6(a) applies because there is no basis in reason to find that an offer of judgment made *within* five days after the close of discovery is ineffective. The offer remained open on the day the school district claims it should have been made. Further, the school district did not object to the offer's "untimeliness" at the time the offer was made, but only raised the issue after trial. We therefore affirm the trial court's award of prejudgment interest under AS 09.30.065.

## C. AWARD OF ACTUAL EXPERT WITNESS FEES.

After trial Tundra Tours submitted a cost bill requesting that the school district pay the full fees of two expert witnesses who testified for Tundra Tours.[30]

The school district objected to Tundra Tours' request on the grounds that Administrative Rule 7(c)[31] limits expert witness fees to twenty-five dollars per hour, and that Tundra Tours had failed to segregate noncompensable preparation time from recoverable trial time.

The trial court found that the school district's actions after Tundra Tours' offer of judgment on March 2, 1984 were "in bad faith, vexatious and for the purposes of dely [sic]" and awarded Tundra Tours the full amount requested, $7,750.

The trial court's ruling was apparently based on this court's dictum in *Miller v. Sears*, 636 P.2d 1183, 1195 (Alaska 1981). In *Miller*, we stated:

> Absent extraordinary circumstances, such as bad faith or reprehensible conduct, not existing here, the prevailing party may receive as costs only those expert witness fees specified in Administrative Rule 9(c) [recodified as 7(c)]; fees for an expert who does not testify, or fees for necessary preparation time for an expert who does testify may not be recovered.

*Id.* at 1195 (footnote omitted).

In *Eagle Air, Inc. v. Corroon & Black/Dawson & Company of Alaska*, 648 P.2d 1000, 1006–07 (Alaska 1982), we reaffirmed the *Miller* ruling and reiterated

---

event, or default from which the designated period of time begins to run is not to be included. The last day of the period is to be included, unless it is a Saturday, a Sunday, or a legal holiday; in which event the period runs until the end of the next day which is not a Saturday, Sunday, or legal holiday. *When the period of time prescribed or allowed is less than seven days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.* A half holiday shall be considered as other days and not as a holiday. (Emphasis added).

28. AS 01.10.080 provides:
 The time in which an act provided by law is required to be done is computed by excluding the first day and including the last, unless the last day is a holiday, and then it is also excluded.

29. Holiday has been defined as "a day upon which the usual operations of business are suspended and the courts closed, and, generally, no

legal process is served." *David v. Sturm, Ruger & Co.*, 557 P.2d 1133, 1135 (Alaska 1976). For the purposes of this section, Saturday is a court holiday.

30. According to the cost bill, witness Paul Taylor had devoted 40 hours of his time, at the rate of $90 per hour for a total charge of $3,600, in preparing testimony and attending trial. Witness Thomas Hyatt had devoted 83 hours, at the rate of $50 per hour for a total charge of $4,150, in performing research and consultations in preparation for trial.

31. Alaska R.Admin.P. 7(c) states in pertinent part:
 A witness called to testify as an expert shall receive additional compensation to be fixed by the judge with reference to the value of the time employed and the degree of learning or skill required; but such additional compensation shall not exceed $25.00 per hour while so employed and testifying, except as otherwise provided in these rules.

that Administrative Rule 7(c) limits additional compensation for expert witnesses to "$25.00 per hour while so employed *and testifying.*" (Emphasis in opinion). In a second case that year, we stated that a time sheet detailing the hourly breakdown of the expert witness' time is required, even if the trial judge knows the number of hours involved, because otherwise it is impossible to determine on review whether or not the requirements of Administrative Rule 7(c) have been met. *Truckweld Equipment Co. v. Swenson Trucking & Excavating, Inc.,* 649 P.2d 234, 241 (Alaska 1982).

We do not believe this case presents those extraordinary circumstances where the losing party should be punished for pursuing a frivolous claim after an offer of judgment has been made.[32] The mere fact that the school district persisted in taking its case to trial does not support a finding of bad faith, especially where the school district prevailed in the trial court on at least two important issues, (i.e., the lack of a contract for nonmaintained service after the first month and the billing practices for summer special education services). We believe the trial court's finding of bad faith is clearly erroneous. The trial court thus should not have awarded Tundra Tours the full fees of its two expert witnesses. On remand, the court should require a breakdown of the experts' time, and award fees in accordance with Administrative Rule 7(c).

### D. AWARD OF RULE 82(a)(1) ATTORNEY'S FEES.

█ After trial, Tundra Tours requested that the court award it attorney's fees in the amount of $172,414.89, pursuant to the schedule in Alaska R.Civ.P. 82(a)(1), upon the $1,715,648.91 judgment.

In response, the school district requested that Tundra Tours indicate what its actual fees were and how many hours its counsel spent on the case. Tundra Tours refused. The superior court entered an award for the amount Tundra Tours requested pursuant to the Rule 82 schedule. The school district contends that it is reversible error to enter an award of attorney's fees when the prevailing party has refused access to information regarding actual fees incurred.

Civil Rule 82(a)(1) sets forth a "presumptive schedule" of attorney's fees.[33] *Davis v. Hallett,* 587 P.2d 1170, 1171 (Alaska 1978). This court will interfere with the trial court's exercise of discretion in awarding attorney's fees under Rule 82 only where such discretion is abused. Abuse of discretion is established where it appears that the trial court's determination was manifestly unreasonable. *Palfy v. Rice,* 473 P.2d 606, 613 (Alaska 1970).

We have affirmed awards consistent with the Rule 82(a)(1) schedule where they do not include an itemization of cost. *Kaps Transport, Inc. v. Henry,* 572 P.2d 72, 76 (Alaska 1977). In *Kaps Transport,* the party requesting attorney's fees did not submit an affidavit itemizing her expenditures. She did, however, submit a memorandum supporting her motion, and her attorney discussed the fee arrangement on the record at the cost hearing. *Id.* at 76, n. 8. We found no error in awarding attorney's fees according to the presumptive schedule under those circumstances.

---

**32.** In its brief, Tundra Tours cites various instances of the school district's alleged bad faith, both *before* and *after* the offer of judgment on March 7, 1984. The trial court's finding of bad faith refers to the school district's conduct *after* the offer of judgment. Tundra Tours' cited evidence of the school district's conduct during the contract performance is therefore not relevant.

**33.** Alaska R.Civ.P. 82 provides in part:

(a) Allowance to Prevailing Party.

(1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered

to in fixing such fees for the party recovering any money judgment therein:

ATTORNEY'S FEES IN AVERAGE CASES

| | | Contested | Without Trial | Non-Contested |
|---|---|---|---|---|
| First | $2,000 | 25% | 20% | 15% |
| Next | $3,000 | 20% | 5% | 12.5% |
| Next | $5,000 | 15% | 12.5% | 10% |
| Over | $10,000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court in its discretion in a reasonable amount.

The instant case presents a similar scenario. Tundra Tours did not submit an affidavit itemizing expenditures. However, in its memorandum in support of its motion, Tundra Tours stated a number of factors which had required its counsel to expend a substantial amount of preparation time. The case was three years old at the time of trial, the issues and evidence were complex, and extensive discovery was taken in Juneau and Fairbanks. Notably, the court was also impressed with counsel's ability to try the case in four days. The court stated:

> The Court would like to commend counsel on the thoroughness and the excellent presentation of this case. It's a complex case in the sense of the figures and so forth involved, and counsel have been certainly very diligent in the preparation.... It's one of the best prepared cases that's come before this court.

In light of the complex nature of the case, and giving deference to the trial judge's observations of the performance of counsel, the trial court's award was not manifestly unreasonable. We therefore affirm the award of $172,414.89.

### E. WAS TUNDRA TOURS' COST BILL UNTIMELY UNDER RULE 79(a)?

In April 7, 1984, the trial court verbally granted Tundra Tours judgment against the school district. On April 13, Notice of Entry of Judgment was filed. Tundra Tours filed its cost bill on April 16. The school district received notice of the cost hearing on April 16. The school district's attorney, Ron Noel, attended the cost hearing on April 20. The clerk considered the school district's objections, and granted costs in the amount of $10,484.73 (out of the $20,441.30 requested). On April 27, 1984, Judge Hodges signed a written judgment granting costs of $19,345.62, of which $7,750 were expert witness fees. Based upon the stipulation between the Fairbanks North Star Borough and the State concerning the third-party claims, Judge Hodges entered an order on June 20, 1984 which stated:

> [T]he court determines that there is and was no just reason for delay in entering a final judgment on all of the plaintiff's claims against the defendants, and further orders that *the judgment entered on April 27, 1984, shall be treated as a final judgment for purposes of Rule 54(b) of all of the plaintiff's claims against the defendants, but shall not apply to the issue of the timeliness of the cost hearing.*

(Emphasis added).

The school district does not challenge the granting of certain costs by the clerk. The school district claims only that Tundra Tours' "early" cost bill and the cost hearing were "untimely" under Civil Rule 79(a).[34]

Tundra Tours claims that its cost bill was timely under Rule 79(a) because its April 16 cost bill was filed within ten days of the date of the trial court's verbal judgment against the school district (April 7), and within ten days of the date of notice of judgment (April 13).

The school district cites *Isaacson Structural Steel Co. v. Armco Steel Corp.*, 640 P.2d 812 (Alaska 1982) as authority for its position that a premature cost bill is untimely under Rule 79(a). In *Isaacson*, this court held that a cost bill filed one month before the entry of final judgment is not in compliance with Rule 79(a), but that it was "senseless formalism" to hold that Armco waived its right to recover costs by failing to comply strictly. *Id.* at 814–15. This court remanded the case, however, because

---

**34.** Alaska R.Civ.P. 79(a) states in pertinent part:
*Within 10 days after the date shown in the clerk's certificate of distribution on the judgment,* a party entitled to costs shall serve on each of the other parties to the action or proceeding a cost bill, together with a notice of the date and time of the cost bill hearing at which the clerk will tax costs.... Failure of a party to serve a cost bill and notice as required by this subdivision shall be construed as a waiver of his right to recover costs.
(Emphasis added).

the trial court deprived Isaacson of a hearing on costs before the clerk of the court, mandated by Rule 79, when it simultaneously entered judgment and awarded costs. *Id.* at 815.

This case is not the same as *Isaacson.* Tundra Tours' allegedly premature submission of the cost bill did not deprive the school district of a timely hearing. On the contrary, the school district attended the cost hearing, and stated its objections verbally and in writing.

We believe it would be "senseless formalism" to hold that the cost bill was untimely. The result would not differ if we were to remand the issue of costs for further proceedings, since the school district has not appealed the clerk's costs award. We therefore affirm the trial court's cost award.

This case is AFFIRMED in part, REVERSED in part and REMANDED for further proceedings consistent with this opinion.