Connie S. BENNETT, Appellant/Cross–
Appellee,

v.

William D. ARTUS, Appellee/Cross–
Appellant.

Nos. S–9186, S–9225.

Supreme Court of Alaska.

March 30, 2001.

Thomas J. Yerbich, Law Office Thomas J. Yerbich, Anchorage, for Appellant/Cross–Appellee.

Charles E. Cole, Law Offices of Charles E. Cole, Fairbanks, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. *INTRODUCTION*

A lawyer had a romantic relationship and business dealings with his client. When disputes arose, the client sued the lawyer for damages. He counterclaimed. After a bench trial, the superior court offset some of their claims and awarded the client about $66,000. Both parties appeal. We affirm in all respects.

## II. FACTS AND PROCEEDINGS

Connie Bennett met attorney William Artus in 1980 when she and her then-husband hired Artus to handle their personal bankruptcy. Bennett hired Artus in 1981 and 1986 to do legal work for her business; by mid–1987 their relationship had become romantic. Three of their business activities are relevant here: (1) they remodeled a condominium which Bennett bought on Artus's behalf; (2) Artus identified a Fairbanks office building that was for sale, helped Bennett purchase it, and performed legal services relating to its management; and (3) Artus represented Bennett in numerous forcible entry eviction and detainer (FED) lawsuits and in another matter.

The proceedings germane to this appeal are not complex. In 1992 Bennett filed a multi-count complaint against Artus asserting claims not relevant here. Her 1993 amended complaint included claims alleging that Artus had defaulted on several loans and seeking reimbursement for items allegedly purchased on Artus's behalf. Artus counterclaimed to recover amounts Bennett allegedly owed him for the condominium remodel and for his services concerning the Fairbanks office building and the lawsuits. After dismissal or settlement resolved many of the parties' claims, the superior court held a bench trial on their unresolved disputes. It entered extensive written findings and conclusions and in May 1998 entered judgment for Bennett for $66,119.04, plus costs and attorney's fees. Bennett and Artus both appeal.

## III. DISCUSSION

### A. Standard of Review

■■■ We apply the clearly erroneous standard of review in evaluating the trial court's factual findings.[1] We exercise our independent judgment when considering any questions of law.[2]

### B. The Condominium Remodel Credit

Bennett argues that it was error to reduce the amount Artus owed her by what Artus expended in remodeling her condominium.

Artus wanted to buy an Anchorage condominium but had difficulty getting financing. In November 1989 Bennett bought a condominium on Artus's behalf, with the oral understanding that they would remodel it and that he would later buy it from her by paying her the $119,000 purchase price, her remodel costs, and a mark-up. Artus did not put their agreement in writing.

Bennett and Artus proceeded with the remodel. Artus treated the condominium as if he owned it. He commissioned an architect and hired George Janssen to act as general contractor. He also paid many remodel expenses himself. The remodel was comprehensive. It included new floors, new cabinets, a new bathroom, new sheet rock, and reinforced studs. But upon completion, Artus could not obtain financing sufficient to purchase the condominium from Bennett as agreed.

Artus's counterclaim alleged that he and Bennett had agreed that if he did not purchase the condominium from her, she would reimburse him for the actual costs and expenses he contributed to the remodel. He claimed that he spent more than $45,000 on the remodel. Bennett testified at trial that she had never authorized him to make independent expenditures to improve the condominium. She argued that because there was no written agreement between lawyer and client, Artus was entitled to no recovery.

Following trial, the superior court found that Artus had contributed $39,544.64 to the remodel. Finding that his contributions benefitted Bennett "through enhanced market value," the superior court gave Artus a credit for the full $39,544.64, and subtracted that amount from what he owed Bennett. This "remodel credit" included $13,034.75 for legal services Artus provided to contractor Janssen to discharge a remodel bill that Bennett had refused to pay in full.

---

1. See City of Hydaburg v. Hydaburg Co-op. Ass'n, 858 P.2d 1131, 1135 (Alaska 1993); Alaska R. Civ. P. 52(a).

2. See Langdon v. Champion, 752 P.2d 999, 1001 (Alaska 1988).

The court therefore grounded its decision in the law of unjust enrichment or quantum meruit. We treat unjust enrichment and quantum meruit claims as essentially the same.[3] Under our law of unjust enrichment, Artus, as the party seeking the credit, had the burden of showing that (1) he conferred a benefit upon Bennett; (2) Bennett appreciated the benefit; and (3) Bennett accepted and retained the benefit under circumstances making it inequitable for her to retain the benefit without paying Artus the value thereof.[4] Moreover, Artus had the burden of proving the value of the benefits he conferred upon Bennett.[5]

### 1. Failure to "document" agreement

The superior court found that Artus had entered into two business transactions with Bennett involving the condominium: one to purchase and remodel it, and another to furnish it. The superior court found that "[n]o executed documents evidence the agreements defendant and his client reached regarding either transaction. Without appropriate documents to protect his client, the defendant's use of the client's money to provide him with a fully remodeled, furnished residence lacks integrity, is unfair and inequitable."[6]

Relying on this finding, Bennett argues that the superior court erred by crediting Artus in quantum meruit for his remodel expenses. In effect, Bennett reasons that because the court found that Artus's conduct "lacked integrity," was "unfair," and "inequi-table," Artus could not invoke equity to seek a credit for his remodel expenses.

We disagree. Although the superior court condemned Artus's conduct, it could have permissibly concluded that a greater inequity would result if Bennett were to retain the benefit of Artus's uncompensated contributions. Further, we are not convinced that the quoted finding is inconsistent with the result. The finding addresses Artus's use of "the client's money." The court may not have intended the finding to apply to Artus's claim based on the expenditure of his, not her, money. Finally, Artus received only a setoff, not an affirmative recovery.

### 2. Legal services trade-out with the remodel contractor

Artus hired Janssen, a friend and legal client, to be general contractor on the remodel. Janssen took instructions from both Artus and Bennett, but billed Artus for services through the early summer of 1990. Both Artus and Bennett paid those bills. Artus testified that he also traded his legal services for Janssen's contracting work.

In July 1990 Bennett challenged one of Janssen's bills. She wrote Janssen a letter expressing her disappointment with the quality of work; although his bill was for $21,166.62, she sent him a check for $9,434.98. Her letter stated that the check would "cover all amounts due."

Artus disagreed with Bennett's refusal to pay Janssen's bill in full. Artus testified that the work was "satisfactory," that Bennett's

---

**3.** "Courts generally treat actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law, and *quantum meruit* as essentially the same. In fact, this 'terminology' is generally employed interchangeably, often within the same opinion." *Alaska Sales & Serv., Inc. v. Millet,* 735 P.2d 743, 746 n. 6 (Alaska 1987) (citation omitted), *cited in Brady v. State,* 965 P.2d 1, 13 n. 38 (Alaska 1998). *But see Fairbanks N. Star Borough v. Tundra Tours, Inc.,* 719 P.2d 1020, 1029 n. 15 (Alaska 1986) (dictum distinguishing between unjust enrichment and quantum meruit).

**4.** *See Beluga Mining Co. v. State, Dep't of Natural Resources,* 973 P.2d 570, 579 (Alaska 1999); *Alaska Sales & Serv.,* 735 P.2d at 746.

**5.** *See Nordin Constr. Co. v. City of Nome,* 489 P.2d 455, 465–66 (Alaska 1971).

**6.** Artus's involvement in the remodel apparently ended before 1993. Alaska Rule of Professional Conduct 1.8(a)(3), which took effect July 15, 1993, provides that "[a] lawyer shall not enter into a business transaction with a client ... unless ... the client consents in writing thereto." When Artus entered into the condominium transactions, DR 5–104(A) of the Code of Professional Responsibility applied. It provided that "a lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

refusal to pay was "unreasonable," and that Janssen was a "friend and client." He said he was "not going to let him go unpaid." To satisfy the outstanding amount, Artus provided Janssen legal services worth at least $13,034.75.[7] Because this $13,034.75 was included in the total $39,544.64 remodel credit, the superior court effectively required Bennett to reimburse Artus for this service trade-out.

Bennett asserts that it was error to give Artus the $13,034.75 credit. She reasons that he breached a fiduciary duty he owed her because, by satisfying Janssen's bill, Artus favored one legal client, Janssen, over another, Bennett; he was therefore ethically and equitably ineligible for any credit. She argues that satisfying the bill harmed her, and "effectively stripped [her] of her ability to contest the matter with Janssen." She also claims that by satisfying the bill, Artus became subrogated to Janssen's rights against Bennett, requiring that Artus prove Bennett "owed an obligation" to Janssen.

Artus responds that Janssen billed him, not Bennett, for the condominium work, and that he could not have breached any duties to Bennett by paying a bill that he was personally liable to pay. Bennett does not deny that Artus may have been obligated on the bill.

Bennett's argument is terse and undeveloped. It does not convince us that Artus breached any ethical duty by discharging an obligation Artus owed Janssen. Nor has Bennett established any other reason why Artus should be altogether disqualified from seeking a credit for the benefit he conferred on Bennett by satisfying the bill.

### 3. *Value of benefit conferred*

Bennett next argues that any credit must be measured by the value of the benefit she received, not the expense Artus incurred. She contends that no specific fact findings support the superior court's determination that Bennett's benefit had value of $39,544.64. She claims that Artus's contributions did not confer a "dollar-for-dollar" benefit on her. In effect, she argues that Artus's remodel expenditures did not benefit her to the extent found by the superior court.

■ Artus was entitled to a credit measured by the value of the benefit he conferred on Bennett.[8] That value does not necessarily equal what he spent.

■ The superior court observed that "[i]n determining the reasonable value of benefits retained, the court may consider the costs to the bestower together with the other evidence of value." In support of that proposition, it appropriately cited *Fairbanks North Star Borough v. Tundra Tours, Inc.*[9] We review the superior court's fact findings for clear error.

Two circumstances lead us to conclude that the superior court did not clearly err in calculating the value of the benefit conferred at $39,544.64. Most importantly, it found that Artus had proved that he spent that much on the remodel. The superior court's page-specific citation of *Tundra Tours* confirms that it was well aware both that the cost to the bestower is relevant to the value conferred and that a quantum meruit recovery is measured by the value of the benefit conferred. The court's written decision twice found that Artus's remodeling expenses conferred a benefit on Bennett by enhancing the condominium's fair market value. Given its awareness of the principle that controls valuation of a quantum meruit recovery, we think it clear that the superior court implicitly and

---

7. The record is inconclusive about the exact amount of Artus's payments and trade-outs to Janssen. But the parties accept the superior court finding that Artus's $39,544.64 contribution included $13,034.75 in trade-outs with Janssen, and that this amount directly related to Janssen's challenged bill.

8. *See Nordin Constr. Co.,* 489 P.2d at 465 (holding that party seeking recovery upon unjust enrichment theory must prove "the value to the [recipient] of the performance tendered"); *see*

*also George v. Custer,* 862 P.2d 176, 180–81 (Alaska 1993); *Fairbanks N. Star Borough,* 719 P.2d at 1029 n. 15 ("In determining the measure of damages in a claim of unjust enrichment the court focuses upon the amount of benefit which the defendant received which would be unjustly retained, and does not necessarily focus on the value of money, labor, and materials provided by the plaintiff to the defendant.").

9. 719 P.2d 1020, 1029 (Alaska 1986).

permissibly found that Artus's contributions conferred a benefit worth not less than what he paid. We also observe that there was evidence about what parts of the remodel Artus paid for, including payments for some basic repairs, such as new flooring and kitchen and bathroom cabinets. There was also evidence that some expenses he bore were for less important improvements, but it was for the trial court to assess the effect of the improvements, and it permissibly could have found from this evidence that the cost incurred at least equalled the benefit conferred.

Second, the general contractor, Janssen, testified that "any time that you remodel a building you add the value of the remodeling at least to the value of that particular piece of property." The court could weigh the value of that opinion in considering the value of the benefit.

■ Bennett argues, however, that she personally spent between $110,000 and $115,000 on the remodel, and that there was evidence that the condominium's value had increased by no more than $75,000. From this she reasons that because the superior court gave Artus a dollar-for-dollar credit, it implicitly must have found that each dollar Bennett spent only increased the condominium's value by about thirty-two cents. Because no evidence supports that implied finding, she argues, Artus should receive only a pro rata credit, limiting his credit to $19,772, at most.

But Bennett's analysis in part would require us to assume that any appreciation can be accurately measured by the difference between two tax appraisals.[10] We have previously observed that tax appraisals do not reliably measure true value.[11] Furthermore, although the purchase price of the condominium was $119,000, that does not prove that the court thought the condominium was necessarily worth that much when Bennett purchased it. Finally, there was other evidence of substantially higher post-remodel value, including an appraisal in 1995 and Bennett's asking price in 1996. Therefore, the superior court may have justifiably reasoned that the remodel caused much greater appreciation than the maximum $75,000 Bennett claims. Some evidence would have permitted the court to conclude that the value increased by nearly $150,000, an amount not significantly less than the total of what Artus and Bennett claimed they spent on the remodel. A dollar-for-dollar credit to Artus would not have been inconsistent with appreciation of this magnitude. In any event, the superior court was not obliged to find that all of the costs Bennett claimed to have incurred were properly attributed to the remodel or were adequately proved. For these reasons, it was not necessarily clearly erroneous to value the benefit Bennett realized by what Artus spent.

Bennett also argues that Artus was not entitled to a dollar-for-dollar credit for the legal services trade-out. The evidence permitted a conclusion that Artus proved that his trade-outs conferred a benefit on Bennett, that Bennett appreciated that benefit,[12] and that allowing Bennett to retain that benefit would be inequitable.[13]

But there was also evidence that Janssen's disputed service bill encompassed work that was deficient, requiring Bennett to hire new workers to correct the deficiencies at consid-

10. Bennett purchased the condominium for $119,000 in November 1989. In May 1992, after the remodel was complete, the Municipality of Anchorage appraised the property at $185,000 (valued as of January 1, 1992), an apparent increase in value of only $66,000. The superior court found that Artus contributed $39,544.64 to the remodel. But it also noted that a Bennett exhibit listed her remodel costs as totaling between $110,000 and $115,000. Thus, Bennett and Artus together spent between $149,544.64 and $154,544.65 on the remodel.

11. See Zerbetz v. Municipality of Anchorage, 856 P.2d 777, 783 (Alaska 1993) (rejecting reliance on tax appraisals to show diminished value); State v. 45,621 Sq. Ft. of Land, 475 P.2d 553, 557 (Alaska 1970) (holding that tax appraisals are not admissible to establish fair market value because they are "notoriously unreliable as a criterion of true value").

12. See Alaska Sales & Serv., 735 P.2d at 747 (equating "appreciat[ion]" of benefit with defendant's acknowledgment that benefit received actually "enhanced the value" of defendant's property).

13. See Beluga Mining Co., 973 P.2d at 579.

erable expense to her, and allegedly justifying her decision to pay him less than half the amount he billed. The amount of the trade-out was part of the $39,544.64 credit the court awarded, based on its finding that Artus had contributed that amount to the remodel. What we said about the total value of the benefit conferred applies equally to this component of Artus's contribution.[14]

### C. *Bennett's December 1990 and May 1991 Payments to Artus*

■ Bennett asserts that it was error to find that two payments she made to Artus were payments for legal services, rather than loans he was obliged to repay.

In the fall of 1989 Artus worked between forty and fifty hours a week to help Bennett acquire a Fairbanks office building. After she purchased it, Artus worked on legal matters concerning the building. Bennett paid Artus for legal services he rendered in connection with the building.

The checks Bennett wrote to Artus included a December 1990 check for $5,000 and a May 1991 check for $20,000. Bennett testified that these two payments were loans, but the superior court found that they were compensation for services Artus rendered, and thus were not to be repaid.

To support her argument that these payments were loans, Bennett points to evidence that her tax returns did not deduct either payment, that Artus's tax returns did not declare either payment as income, and that her 1990 financial statement lists a $5,000 loan to Artus and her 1991 financial statement lists a $20,000 loan to him.[15] Bennett asks us to hold that the superior court's finding was clearly erroneous.

The superior court did not clearly err. No loan documents in evidence support Bennett's claim. In contrast, two other loans

from Bennett to Artus were evidenced by formal loan documents. The checks contain no clear notations showing that they were loans. And the superior court noted Bennett's testimony that Artus worked forty-to-fifty hour weeks throughout the acquisition period; this evidence supported a conclusion he had earned these payments. Likewise, the superior court could have relied on its findings that Artus had performed substantial office building-related legal work for Bennett after the acquisition. And finally, the superior court apparently believed Artus's trial testimony that Bennett had paid him for legal services rendered, and that he had received these two checks in the form of distributions from an informal partnership in the building. Artus also notes that Bennett did not request repayment of these monies in pre-suit correspondence listing monies owed.

Given the evidence, it was not clear error to find that these two payments were for legal services and were not loans.

### D. *Bennett's Request for Disgorgement of Legal Fees*

■ Bennett contends that it was error not to require Artus to disgorge $23,834.31 in legal fees that Bennett paid him in May 1990 for his Fairbanks office building services. Relying on Artus's expressed belief that they had an oral contingent fee agreement for the building, Bennett argues that Alaska Bar Rule 35(c) requires disgorgement.[16]

We are unpersuaded. The unenforceability of the contract he thought they had does not prevent Artus from retaining fees compensating him fairly for work benefitting his client. We held in *Estate of Katchatag* that even though an attorney operated under an unenforceable fee-sharing agreement, he could seek compensation in quantum meruit for his work.[17] Artus advanced the same theory in the superior court to successfully

---

**14.** *See Fairbanks N. Star Borough,* 719 P.2d at 1029.

**15.** Bennett's 1991 financial statement asserted that Artus owed Bennett $75,000. This total could plausibly include the alleged December 1990 $5,000 loan, an undisputed $50,000 loan, and the alleged May 1991 $20,000 loan.

**16.** Alaska Bar Rule 35(c) provides that "[a] contingent fee agreement will be in writing and will include the disclosure required under Alaska Rule of Professional Conduct 1.4(c) and state the method by which the fee is to be determined...." This language was in effect during the relevant periods.

**17.** 907 P.2d 458, 464 (Alaska 1995).

defeat Bennett's disgorgement claim. Bennett admits on appeal that Artus performed valuable services for which she voluntarily paid what she thought were "reasonable" fees. The superior court did not err in concluding that Artus was entitled under quantum meruit principles to keep the monies Bennett paid him for his legal services.

 Bennett's reply brief raises a new argument for disgorgement. It asserts that because Artus was a full-time employee of Good Taste, Inc., a business owned by Bennett, when he performed the legal services, he could not be paid those fees for services performed on an hourly basis. We decline to address this argument because Bennett failed to raise it in her opening brief, and thereby denied Artus the opportunity to respond to it.[18]

### E. The Litigation Legal Fees

Artus argues in his cross-appeal that it was clear error to deny his $12,000 quantum meruit claim for services he rendered representing Bennett in numerous FED lawsuits against her tenants and in another lawsuit. The superior court denied this claim. In explaining its reasoning, the superior court referred to three factors, all supported by the record, each of which justifies denial of this claim.

 First, the court noted that Artus kept no records establishing the nature, scope, or duration of his legal services, and that this lack of disclosure prevented both client and court from determining the reasonableness of the fees per the guidelines set by Alaska Bar Rule 35(a).[19]

 Second, the court found that Artus failed to establish by clear and convincing evidence that he was owed $13,900 for ser-

vices on miscellaneous matters (including the litigation matters) and took note of evidence that the FED work "languished" and was in part incomplete. Consequently, there was a genuine dispute about the quality and value of this work, justifying a conclusion that Artus had not proved the value of the benefit conferred.

 Third, the court referred to evidence justifying a conclusion that Artus did the FED work gratuitously, as Bennett argued below and argues on appeal. She points out that Artus submitted no evidence that he had expected payment for these services. She relies on our opinion in *Brady v. State*, where we held that "[i]t is not unjust to retain a benefit given without expectation of payment."[20] There is ample evidence that Artus offered his FED legal services gratuitously. When given the opportunity to bill Bennett for his services, Artus repeatedly declined to do so, even though his law firm had billed Bennett for court costs. Even on appeal, Artus does not argue that he had expected to be compensated for these services. And given the parties' personal relationship and Artus's testimony that he did not bill Bennett for legal services because "that's just the way it worked," the superior court could permissibly conclude that Artus did not expect to be paid.[21]

It was therefore not error to deny this claim.

### IV. CONCLUSION

For the reasons discussed above, we AFFIRM the judgment in all respects.

---

18. *See K.E. v. J.W.*, 899 P.2d 133, 135 n. 2 (Alaska 1995) (holding appellant's argument waived because it was not raised in opening brief) (citing *Hitt v. J.B. Coghill, Inc.*, 641 P.2d 211, 213 n. 4 (Alaska 1982) (holding that points are waived when argued only in reply brief and not in opening brief)).

19. Alaska Bar Rule 35(a) provides that the reasonableness of an attorney's fee is affected by factors such as the time and labor involved, the customary fees for similar services, and the nature and length of the professional relationship.

20. 965 P.2d 1, 14 (Alaska 1998); *see also Sparks v. Gustafson*, 750 P.2d 338, 342 (Alaska 1988) ("Courts will allow the defendant to retain a benefit without compensating plaintiff in several situations, one of which is relevant to the case at hand: where the benefit was given gratuitously without expectation of payment.") (citing *Murdock–Bryant Constr. v. Pearson*, 146 Ariz. 48, 703 P.2d 1197, 1203 (1985)).

21. *See Sparks*, 750 P.2d at 342–43 (noting relevance of close personal relationships when evaluating evidence of gratuitousness).