NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

MARGARET VALERIE WILLIAMS,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13714
Trial Court No. 3AN-17-01886 CR

O P I N I O N

No. 2769 — December 29, 2023

Appeal from the Superior Court, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Jason A. Weiner, Jason Weiner and Associates, PC, Anchorage, under contract with the Office of Public Advocacy, for the Appellant. Eric A. Senta (initial brief) and James J. Fayette (supplemental brief), Assistant Attorneys General, Office of Special Prosecutions, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Harbison and Terrell, Judges.

Judge TERRELL.

Margaret Valerie Williams was convicted, following a jury trial, of two counts of felony medical assistance fraud and one count of scheme to defraud based on fraudulent billing for services designed to provide skills that would assist with

community reintegration (day habilitation services).[1]  But the jury acquitted Williams of a third count of felony medical assistance fraud based on fraudulent billing for residential supported-living services.[2]

Following a restitution hearing, the superior court ordered Williams to pay restitution to the Alaska Department of Health and Social Services (DHSS) in the amount of $1,153,474.88.   Of this restitution award, $734,799 was for conduct for which Williams was convicted, but $418,675.88 was for conduct for which Williams was acquitted.

On appeal, Williams challenges both aspects of the restitution award.  We conclude that the superior court erred in awarding restitution for conduct for which Williams was acquitted.  We therefore vacate that portion of the award.  With respect to the restitution for conduct for which Williams was convicted, we affirm this portion of the award.

*Background facts and proceedings*

Williams owned Flamingo Eye, LLC, a company that operated several assisted living homes.  The clients were adults with varying combinations of long-term mental and physical disabilities, and who needed substantial assistance with the activities of daily living.  Most of the clients were supposed to live in a group-home setting, but some were authorized to live alone in an apartment or house.

---

[1]  AS 47.05.210(a)(1) and AS 11.46.600(a)(2), respectively.

[2]  AS 47.05.210(a)(1).

Medicaid funded the services provided to the clients identified in the indictment, as they were all Medicaid recipients.[3] Each year, DHSS employees met with representatives of Flamingo Eye and of each client to formulate a "plan of care" for that client. Once formalized, the plan of care specified precisely which services Flamingo Eye would provide the client. Under this arrangement, Flamingo Eye could only bill Medicaid for services that were pre-authorized in the client's plan of care.

The fraud in this case came to light in an unusual way. In November 2015, the Anchorage Police Department investigated a homicide at a Flamingo Eye assisted living home and discovered that the home was understaffed when the homicide occurred. The police notified DHSS, who opened an investigation. DHSS investigators discovered that Flamingo Eye homes were chronically understaffed, but that Flamingo Eye nonetheless engaged in robust billing practices. DHSS concluded that Williams, through Flamingo Eye, had committed substantial Medicaid fraud.

Williams's appeal primarily concerns billing practices for services provided to a Flamingo Eye resident, J.P., from November 2013 through December 2015. J.P.'s yearly plan of care authorized her to receive funding for "Residential Habilitation services in the form of Supported Living" — *i.e.*, an arrangement where she was the sole resident of an apartment or house, with staff providing one-on-one care. Medicaid paid between approximately $541 to $554 per day for these services.

The DHSS investigation revealed that, while Flamingo Eye consistently billed Medicaid for J.P.'s residential supported-living services, she did not generally

---

[3] "The Medicaid program is 'a cooperative federal-state partnership under which participating states provide federally-funded medical services to needy individuals.'" *Hidden Heights Assisted Living, Inc. v. State, Dep't of Health & Soc. Servs., Div. of Health Care Servs.*, 222 P.3d 258, 261 (Alaska 2009) (quoting *Garner v. State, Dep't of Health & Soc. Servs., Div. of Med. Assistance*, 63 P.3d 264, 268 (Alaska 2003)).

receive such services. Under her plan of care, J.P. was supposed to live as the sole resident of an apartment or house. However, DHSS learned that while J.P. had a private bedroom on the first floor of the assisted living home, she spent each day in the upstairs portion of the home, dedicated to group-home habilitation. Additionally, J.P. was supposed to receive supportive services in a one-on-one setting. But because of the low staffing levels, J.P. usually received services in a group setting with upstairs residents. Thus, while Flamingo Eye continued to bill Medicaid for residential supported-living services, it provided J.P. services that were more akin to group-home habilitation. Medicaid ordinarily paid for group-home habilitation at a lower rate of between approximately $309 to $317 per day.

The DHSS investigation also revealed that Flamingo Eye engaged in fraud with respect to a different type of care: day habilitation services. These services were designed to help the residents master skills that would assist their integration into the community. As with the residential habilitation services, Medicaid distinguished between individual day habilitation, which had a one-to-one ratio of clients to staff, and group day habilitation. Medicaid billed for individual day habilitation at a higher rate than group day habilitation. The DHSS investigation revealed that Flamingo Eye generally billed Medicaid for individual day habilitation services even though it was not providing one-on-one care.

The State indicted Williams, Flamingo Eye, and three Flamingo Eye employees on various charges, including three counts of felony medical assistance fraud and one count of scheme to defraud. Counts I and III (charging medical assistance fraud) related to billing for day habilitation services, as did Count IV (charging scheme to defraud). Count II (also charging medical assistance fraud) apparently related to billing for residential supported-living services for J.P.

Although Count II of the indictment was apparently intended to charge Williams and her co-defendants for the fraudulent billing of residential supported-living services for J.P., the text of the indictment stated that the charge was for *T2016* billing — the Medicaid billing code for group-home habilitation — as opposed to *T2017* — the Medicaid billing code for residential supported-living services. And the instructions given to the jury for Count II continued this apparent error, telling the jury that the State had to prove:

> 1. The defendant knowingly submitted or authorized the submission of a claim to a medical assistance agency for property, services, or a benefit, to wit: T2016 billings for [J.P.].
>
> 2. The defendant recklessly disregarded that they were not entitled to the property, services, or a benefit; and
>
> 3. The value of the property, services, or benefit was $25,000 or greater.

But the evidence at trial showed that Flamingo Eye only billed Medicaid for residential supported-living services for J.P. under the T2017 code.

The discrepancy between what had been established at trial as to J.P. — that Flamingo Eye billed Medicaid under the T2017 code — and what the jury was required to find under the jury instructions to convict Williams for this charge — that Medicaid was fraudulently billed under the billing code T2016 — did not escape the jury's attention. During deliberations, the jury sent a note to the judge asking, "What is a T2016 violation? *i.e.* were they supposed to bill, but did not. (Or) were they not supposed to bill, and they did." Williams objected to providing any substantive answer to the key question posed by the jurors, arguing that it would have the effect of unduly influencing the jury. The State agreed that "answering the substantive questions would be significantly problematic." The court therefore responded to the jury question by

directing the jurors to refer to its prior instructions and telling them that it could give them no further explanation.

The jury found Williams guilty of Counts I, III, and IV (the medical assistance fraud counts and scheme to defraud count relating to day habilitation services), but it found her not guilty of Count II (the medical assistance fraud count relating to residential supported-living services for J.P.).

The State requested that the superior court impose restitution in the amount of $1,153,474.88. Following a restitution hearing, the court imposed restitution in this amount.[4] Of this figure, $734,799 was for billing Medicaid for individual day habilitation services (*i.e.*, conduct for which Williams was convicted), but $418,675.88 was for billing Medicaid for residential supported-living services for J.P. (*i.e.*, conduct for which Williams was acquitted). Williams now appeals this restitution award.

*Why we reverse the portion of the restitution judgment that is based on conduct for which Williams was acquitted*

First, Williams challenges the portion of the restitution award covering fraudulent billing of residential supported-living services to J.P. — the conduct underlying Count II, for which she was acquitted. As explained above, this accounted for $418,675.88 of the $1,153,474.88 restitution award.

When the State proposed this restitution figure in its sentencing memorandum, it acknowledged that it was seeking restitution for acquitted conduct, but

---

[4] The superior court awarded restitution in two separate orders. The court initially ordered restitution in the amount of $50,000 because Counts I and III each required that the jury find Williams had fraudulently obtained property, services, or benefit in the amount of $25,000 or more. The jury's verdict alone therefore established damages or loss of at least $50,000. Following the restitution hearing, the court entered a separate restitution order in the amount of $1,103,474.88 (or $1,153,474.88 minus $50,000).

it cited *Fee v. State*, *Harris v. State*, *Salvato v. State*, and *Hutchison v. State* for the proposition that "judges may order restitution related to acquitted charges."[5] The State pointed out that Williams had not disputed that her company did not provide J.P. residential supported-living services, and that her defense went only to the applicable mental state for the offense. The State argued that the superior court could independently evaluate the evidence and find that Williams "submitted claims to Medicaid for services they did not provide, and were paid for those services, in the amount of $418,675.88."

At the restitution hearing, the State argued that the court was permitted to award "restitution for acquitted counts" if it found that substantial evidence supported such an award. The State asserted that "the evidence adduced at trial supports a hundred percent restitution for the supported-living billing." Williams's counsel argued that the *Fee/Hutchison* line of cases were distinguishable in that they dealt with restitution in the context of property damage. The court adopted the State's interpretation of the *Fee/Hutchison* line of cases, and ordered restitution in the amount the State requested, $418,675.88, for the residential supported-living services.

On appeal, Williams argues that the award of $418,675.88 in restitution for the residential supported-living services claims submitted for care of J.P. was "insufficiently linked to the crimes [she] was convicted of." She initially requested that we remand for the superior court to make "specific findings regarding the link between the crimes [she] was convicted of and the $418,675.88 in residential habilitation payments."

After the parties' briefing was complete, we issued an order requesting supplemental briefing. We noted our preliminary conclusion that the portion of the

---

5    *Fee v. State*, 656 P.2d 1202 (Alaska App. 1982); *Harris v. State*, 678 P.2d 397 (Alaska App. 1984); *Salvato v. State*, 814 P.2d 741 (Alaska App. 1991); *Hutchison v. State*, 2001 WL 830701 (Alaska App. July 25, 2001) (unpublished).

restitution judgment concerning restitution for residential supported-living services for J.P. was required to be vacated because Williams was acquitted of this conduct. We requested that the parties file supplemental briefs addressing this issue.

Williams's supplemental brief agreed with our preliminary conclusion. The State, on the other hand, responded that all billing for services should be viewed as part of an overarching course of fraudulent conduct for which the superior court could award restitution.

The State misinterprets our precedents related to restitution and uncharged or acquitted conduct. We take this opportunity to provide a detailed explanation of this area of law.

The authority to award restitution in criminal cases is grounded in two statutes. Alaska Statute 12.55.045(a) provides in relevant part, "The court shall, when presented with credible evidence . . . order a defendant convicted of an offense to make restitution as provided in this section, including restitution to the victim or other person injured *by the offense* . . . ."[6] Restitution under this statute "is a condition of the defendant's sentence."[7] Alaska Statute 12.55.100(a)(2)(B) allows courts to order a defendant "to make restitution or reparation to aggrieved parties for actual damages or loss *caused by the crime for which conviction was had*" as a condition of probation.[8] We have recognized that these two statutes must be construed *in pari materia*, and that, under these statutes, restitution "should be assessed according to the damages or loss *arising from the defendant's crime*."[9] "That is, the damages for which restitution is

---

[6] Emphasis added.

[7] AS 12.55.045(i).

[8] Emphasis added.

[9] *Welsh v. State*, 314 P.3d 566, 568 (Alaska App. 2013) (emphasis added).

ordered must be caused by the criminal conduct for which the defendant was convicted, not additional uncharged conduct" — "unless the parties have agreed that the defendant will be subject to such a restitution order."[10]

It is true that "[t]he strict elements of the crime of conviction do not necessarily define the parameters of a potential restitution order."[11]  But that does not mean that a court can order restitution for conduct that is distinct from the conduct that resulted in the conviction.[12]  Absent an agreement, it is necessary that the facts establishing the elements of the crime of conviction — the conduct element and the culpable mental state element — actually and proximately caused the damages or loss for which restitution is being ordered.[13]

These principles may be seen in a trio of cases.  In *Pena v. State*, the defendant was convicted of manslaughter after crashing his car into another car, killing the passenger of the other car.[14]  We held that restitution could be ordered for damage to the other car and also for injuries to the *driver* of the other car, explaining that "[u]nder

---

[10]  *Peterson v. Anchorage*, 500 P.3d 314, 319 (Alaska App. 2021); *see also Kimbrell v. State*, 666 P.2d 454, 455 (Alaska App. 1983) (holding that restitution for a separate, dismissed charge may be ordered only if "(1) the amount of loss suffered by an identifiable aggrieved party is certain; (2) the defendant admits, and there is no factual question as to whether, the defendant caused or was responsible for the aggrieved party's loss; and (3) the defendant consents, freely and voluntarily, to make full restitution" (quoting *United States v. McLaughlin*, 512 F. Supp. 907, 908 (D. Md. 1981))).

[11]  *Peterson*, 500 P.3d at 319.

[12]  *Id.*

[13]  *See id.* at 321 ("Alaska employs a test of proximate causation in evaluating claims for restitution in a criminal case." (citing *Ned v. State*, 119 P.3d 446 (Alaska App. 2005))).

[14]  *Pena v. State*, 664 P.2d 169, 171 (Alaska App. 1983), *rev'd on other grounds*, 684 P.2d 864 (Alaska 1984).

the circumstances, property damages and injuries directly sustained by [the driver] were unquestionably the consequence of precisely the same conduct and intent on Pena's part as the conduct and intent that caused the death with which Pena was charged and which led to Pena's conviction."[15]

By contrast, the two other cases recognized limitations on this principle. In *Nelson v. State*, the defendants were convicted of receiving and concealing stolen property after items taken in a string of burglaries were found in their possession.[16] The Alaska Supreme Court reversed a restitution order requiring the defendants to pay restitution for all losses incurred as a result of the burglaries.[17] The supreme court ruled that restitution was appropriate only for the stolen goods that the defendants had been convicted of receiving and concealing. Similarly, in *Schwing v. State*, the defendant was convicted of two counts of selling cocaine to a police informant.[18] The superior court ordered restitution in the amount that the informant had paid for cocaine, for both the two sales for which the defendant was convicted and an additional three sales for which charges had been dismissed. On appeal, we reversed the restitution award for the sales for which the defendant had not been convicted.[19]

The cases the State cited in the superior court for the proposition that "judges may order restitution related to acquitted charges" do not contradict *Nelson* or *Schwing*. In *Fee*, we held that, for crimes that have damages or loss within a certain

---

[15]  *Id.* at 178.

[16]  *Nelson v. State*, 628 P.2d 884, 886 (Alaska 1981).

[17]  *Id.* at 895.

[18]  *Schwing v. State*, 633 P.2d 311, 312 (Alaska App. 1981).

[19]  *Id.* at 313-14.

dollar range as an element, restitution is not limited to that range of values.[20] The defendant in *Fee* pleaded no contest to third-degree criminal mischief, an element of which was that "he damage[d] property of another in an amount of $50 or more but less than $500."[21] We nevertheless upheld a restitution award of more than $500. And we have subsequently clarified that restitution is not limited to the range of values in the offense of conviction even if the defendant was acquitted of a higher level offense with a higher range of values.[22] But, as we expressly stated in *Fee*, restitution is still only appropriate when "the payment is made to 'an aggrieved party' and the amount does not exceed the 'actual damages or loss caused by the crime for which conviction was had.'"[23] Two other cases the State cited — *Harris* and *Salvato* — concerned straightforward applications of our holding in *Fee*.[24]

Finally, in *Hutchinson*, we affirmed an award of restitution to the owner of a vehicle for damage to the vehicle after the defendant was convicted of driving while under the influence of alcohol but acquitted of vehicle theft of that vehicle.[25] This Court held that the superior court was authorized to award restitution for the damage that resulted from the defendant's driving of the vehicle while he was under the influence. *Hutchinson* does not authorize restitution for conduct for which there was no conviction.

---

[20] *Fee v. State*, 656 P.2d 1202, 1205-06 (Alaska App. 1982).

[21] *Id.* at 1203-04 (quoting former AS 11.46.484(a)(1) (1982)).

[22] *See Farmer v. State*, 449 P.3d 1116, 1124-28 (Alaska App. 2019).

[23] *Fee*, 656 P.2d at 1206.

[24] *See Harris v. State*, 678 P.2d 397, 408 (Alaska App. 1984); *Salvato v. State*, 814 P.2d 741, 744 (Alaska App. 1991).

[25] *Hutchinson v. State*, 2001 WL 830701, at *3-4 (Alaska App. July 25, 2001) (unpublished).

In support of its argument on appeal that restitution is appropriate "when the defendant's conduct was a 'single, continuous' course of conduct and the conduct proximately caused the loss," the State additionally cites *Miller v. State* and *J.M. v. State*.[26] In *Miller*, the State charged the defendant with second-degree assault and fourth-degree assault for attacking a woman.[27] Specifically, the second-degree assault charge was based on the allegation that Miller strangled the victim with his hands, and the fourth-degree assault charge was based on the allegation that he scratched her back when he pushed her against the wall to strangle her. At trial, the victim testified that the defendant injured her chest when he stepped on her chest during the incident. The jury found the defendant not guilty of second-degree assault but guilty of fourth-degree assault. The sentencing court ordered the defendant to pay restitution for the costs the victim incurred after going to the emergency room for chest pain and problems breathing.[28]

The defendant appealed the restitution order, arguing that the court had ordered restitution for conduct other than the conduct for which he was convicted.[29] According to the defendant, he had been convicted solely for scratching the victim's back and not for strangling the victim or stepping on her chest. We concluded that the defendant's attack on the victim constituted a single, continuous assault, and noted that had the defendant been convicted of second-degree assault, the two assault convictions

---

[26] *Miller v. State*, 312 P.3d 1112 (Alaska App. 2013); *J.M. v. State*, 786 P.2d 923 (Alaska App. 1990).

[27] *Miller*, 312 P.3d at 1114.

[28] *Id.* at 1117.

[29] *Id.*

would have merged.[30] We concluded that, because the defendant committed a single assault, as opposed to multiple assaults, the superior court properly considered all injuries that the defendant caused in the attack to be the conduct underlying the conviction and properly ordered restitution for all injuries.

In *J.M.*, a minor admitted to allegations in a juvenile delinquency petition that charged him with burglary for unlawfully entering a dwelling with intent to commit the crime of theft and theft for stealing a pair of sunglasses in the dwelling.[31] The superior court ordered the minor to pay restitution for jewelry that his accomplice had stolen from the house. We affirmed, explaining that the minor's "participation in the burglary made him legally accountable as an accomplice of the theft of the jewelry" and therefore that "the loss of the jewelry was an 'actual . . . loss caused by the crime for which conviction was had.'"[32]

In this case, had the jury convicted Williams of fraudulently billing for residential supported-living services, the conviction for that conduct and the conviction for fraudulently billing day habilitation services would not have merged. The fraudulent billings for day habilitation services did not render Williams legally accountable for the fraudulent billings for residential supported-living services to J.P. We therefore cannot conclude that the damages or loss from fraud related to residential supported-living services was "the consequence of precisely the same conduct and intent . . . as the conduct and intent . . . which led to [Williams's] conviction."[33] Instead, the facts of this case are analogous to the facts of *Nelson* and *Schwing*, where the conduct for which

---

[30]   *Id.* at 1117-18.

[31]   *J.M.*, 786 P.2d at 923.

[32]   *Id.* at 924 (omission in original).

[33]   *Pena v. State*, 664 P.2d 169, 178 (Alaska App. 1983).

restitution was awarded went beyond what was related to the conduct for which the conviction was had, requiring reversal.

We acknowledge that restitution from the offender is one of the constitutional bases for criminal administration under Article I, Section 12 of the Alaska Constitution and that "restitution statutes should be construed broadly to effectuate the legislature's purpose of compensating victims and other people fully for losses caused by the defendant's criminal conduct."[34] But, as we recently explained,

> [U]nder the restitution statute, a defendant's liability is limited to the proximate effects of the offense of conviction, since restitution is intended to allow crime victims and others who have suffered losses as a result of a defendant's criminal conduct to recover monetary damages that would otherwise be subject to recovery only in a civil suit. Without such a limitation — and in the absence of an agreement to pay restitution for uncharged conduct — defendants would lack notice of the permissible scope of their financial liability, and their liability would be without any apparent limit.[35]

We accordingly conclude that the superior court was not authorized to award the $418,675.88 in restitution for billing related to residential supported-living services for J.P., and we vacate this portion of the award.

---

[34] *Peterson v. Anchorage*, 500 P.3d 314, 323 (Alaska App. 2021); *see also Maillelle v. State*, 276 P.3d 476, 479 (Alaska App. 2012) ("The Alaska Legislature . . . has made it plain that it intends Alaska's statute to be construed broadly. The statute itself declares that when a court determines the amount of restitution and the method of payment, 'the court shall take into account . . . (1) [the] public policy that favors requiring criminals to compensate for damages and injury to their victims; and (2) [the] financial burden placed on the victim and those who provide services to the victim and other persons injured by the offense as a result of the criminal conduct of the defendant.'" (alterations in original)).

[35] *Peterson*, 500 P.3d at 325 (citation omitted).

*Why we affirm the superior court's award of restitution for the fraudulent billing for day habilitation services*

Williams's second challenge to the restitution judgment has to do with the superior court's method of calculating the amount of restitution. This issue is moot as to the restitution award for residential supported-living services for J.P. because we are vacating that portion of the restitution judgment. We therefore address this issue only as it relates to the $734,799 restitution award related to fraudulently billing for day habilitation services.

At the restitution hearing, the State presented the testimony of Margaret Summers, a forensic accountant with the Medicaid Fraud Control Unit. She testified that she compared the bills Flamingo Eye submitted to Medicaid with Flamingo Eye's internal documentation regarding staffing levels and services provided. Based on this comparison, she determined that at least 83.45% of Flamingo Eye's billing for day habilitation services was unsupported.

In coming to this percentage, Summers assumed that Flamingo Eye's internal documentation of services provided was accurate, but, as the State noted, significant evidence at trial cast doubt on the accuracy of Flamingo Eye's documentation. For example, the Flamingo Eye records claimed the providers were providing the maximum amount of individual services allowed, with the exception of records pertaining to one employee who was fired. But the testimony reflected that Flamingo Eye employees assigned to perform day habilitation were not with the clients for the amount of time entered in the records, and former employees testified that they had been instructed to bill the maximum amount regardless of the hours they actually worked. A repeated typo across the records suggested that those records were simply cut and pasted.

Additionally, Alaska Medicaid regulations required that day habilitation services involved genuine goal-oriented therapeutic work with the client, as opposed to

simply spending time outside the house with the client.[36] But Flamingo Eye's records did not reflect that any therapeutic services had been provided.

The State therefore argued that the 83.45% figure was under-inclusive and that the evidence actually supported the conclusion that all the billings for day habilitation services were unsupported. It asked the court to order restitution for the full $734,799 that Williams had received from Medicaid for these services. Williams's counsel, on the other hand, argued that the court should set restitution at 83.45% of $734,799.

The superior court found that Flamingo Eye's records "lacked any veracity" and that there was no evidence that any therapeutic day habilitation services actually occurred. It accordingly awarded restitution for the full $734,799 that Williams had received from Medicaid for these services.

On appeal, Williams notes that we have held that "restitution . . . should be assessed according to the damages or loss arising from the defendant's crime, and not the amount of the defendant's unjust gain."[37] Williams argues that the restitution award in this case represents her unjust gain rather than the actual losses to the State.

We recently addressed the calculation of restitution for Medicaid fraud in *Choi v. State*.[38] We first endorsed two different methods of calculating damages or loss in fraud cases — the "benefit of the bargain" rule and the "out of pocket" rule.[39] We explained:

---

[36]   *See* 7 Alaska Administrative Code (AAC) 130.260.

[37]   *Welsh v. State*, 314 P.3d 566, 568 (Alaska App. 2013).

[38]   *Choi v. State*, 528 P.3d 463, 467-69 (Alaska App. 2023).

[39]   *Id.* at 467-68.

Under the "benefit of the bargain" rule, a plaintiff is entitled to recover the difference between the actual value of the purchase and the value the purchase would have had if the representations had, in fact, been true. And under the "out of pocket" rule, a plaintiff will recover "the price paid for property [the plaintiff] was induced to buy as a result of the misrepresentation, less the market value of the property." Thus, under both of these approaches for valuing damages, an injured party will recover the actual damages or loss arising from the defendant's conduct, rather than the amount of the defendant's unjust gain.[40]

We also held in *Choi* that the victim in a Medicaid fraud case is DHSS and not the individual Medicaid beneficiaries.[41] "DHSS receives 'value' when Medicaid recipients receive legitimate health care services for which DHSS would pay but for the defendant's fraud."[42] Therefore, under either method, the damages or loss in a Medicaid fraud case is the difference between what DHSS was induced to pay as a result of the defendant's misrepresentations and what DHSS would have paid if the defendant's representations to the Department were accurate.[43]

Thus, "a defendant who fraudulently bills Medicaid for services in excess of those the defendant actually provided will be given credit for the value of the legitimate services provided, as long as the defendant was legally eligible to receive Medicaid payments."[44] And "a defendant [who] fraudulently obtains payment for a

---

[40]  *Id.* at 467 (alteration in original) (citations omitted) (quoting Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies: Damages, Equity, Restitution* § 9.1(1), at 721 (3d ed. 2017)).

[41]  *Id.* at 468.

[42]  *Id.*

[43]  *Id.* at 468-69.

[44]  *Id.* at 469 n.24.

higher level of service than what was provided . . . is entitled to credit for the legitimate services they provided, as long as they were eligible for payment."[45]  But services have no value for restitution purposes if DHSS would not have paid for them, even though the services had some value to the clients.[46]

In this case, the parties do not dispute that DHSS paid Flamingo Eye $734,799 based on its fraudulent representations about providing day habilitation services.  The only question is what DHSS would have paid if Flamingo Eye had accurately represented its services.

The superior court found that Flamingo Eye provided no actual therapeutic day habilitation services that would meet DHSS regulations for valid day habilitation services.  As a result, DHSS would not have paid any money to Flamingo Eye if it had accurately reported what services it was providing.  This finding was not clearly erroneous given the evidence that 83.45% of the billings Flamingo Eye submitted were not justified by its own records, these records appeared to have been falsified, and no documentation demonstrated the provision of any therapeutic services.[47]

Williams argues that the superior court improperly placed the burden of proof on her to prove that she provided legitimate services, as opposed to on the State

---

[45]  *Id.*

[46]  *Id.* at 469.

[47]  *See Noffsinger v. State*, 850 P.2d 647, 650 (Alaska App. 1993) ("[W]e construe the record in the light most favorable to the State and determine whether a reasonable fact-finder could conclude that the disputed amount of restitution was established by a preponderance of the evidence.").

to prove that she did not. Williams did not challenge the allocation of the burden in the superior court and therefore must show plain error.[48]

We have not addressed which party has the burden of proving that legitimate services were provided,[49] and we conclude that we need not resolve this question in this case because the superior court does not appear to have rested its ruling on the allocation of the burden of proof. Instead, the superior court affirmatively found that Flamingo Eye's documentation of the work it provided "lacked any veracity" and no evidence showed that any therapeutic day habilitation services had actually been provided. Thus, any error in placing the burden of proof on Williams was harmless.[50]

The superior court therefore did not err in concluding that the damages or loss stemming from Williams's fraud related to day habilitation services was the full $734,799 she received.

---

[48] *See Adams v. State*, 261 P.3d 758, 764 (Alaska 2011) (holding that a defendant's failure to object to an alleged error in the trial court requires the defendant to show plain error, which is "an error that (1) was not the result of intelligent waiver or a tactical decision not to object; (2) was obvious; (3) affected substantial rights; and (4) was prejudicial").

[49] *Compare Recreational Data Servs., Inc. v. Trimble Navigation Ltd.*, 404 P.3d 120, 137-40 (Alaska 2017) (concluding that the plaintiff had presented sufficient evidence to establish the tort of fraud but had not presented sufficient evidence by which damages could be calculated, and therefore that the plaintiff was entitled to only nominal damages), *with Turner v. Anchorage*, 171 P.3d 180, 187-92 (Alaska 2007) (holding that the defendant has the burden of proving that an offset should be provided for funds previously paid to the plaintiff for the same injury by the defendant), *and Bennett v. Artus*, 20 P.3d 560, 563 (Alaska 2001) (stating that the defendant has the burden of showing that a credit should be awarded to them because the plaintiff would be otherwise unjustly enriched based on a benefit the defendant had conferred to the plaintiff).

[50] *See Adams*, 261 P.3d at 773 (stating that to establish plain error, "the error must be prejudicial," which, for non-constitutional error, means that "there is a reasonable probability that it affected the outcome of the proceeding").

*Conclusion*

We VACATE the portion of the restitution judgment awarding $418,675.88 in restitution for residential supported-living services for J.P., and we REMAND for the superior court to amend the restitution judgment to reflect this. We AFFIRM the portion of the restitution judgment awarding $734,799 in restitution for day habilitation services.